SAWYER *v.* PRICKETT AND WIFE.

A farmer and his wife on the line of a proposed country railroad, subscribed to stock in the road and mortgaged their farm, upon representations made to them by agents of the road and others, in a time of excitement got up at public meetings, that the road would prove a most lucrative investment of money, a very profitable thing to the neighborhood, and would enable farmers to sell the products of their farm at a large advance over existing prices.   The making of the road was begun, and after a good deal of money had been laid out in grading, &c , the further making of it was absolutely stopped for want of funds, and it remained unmade.

---

The mortgage thus got was assigned to a director of the road who was a large creditor of the road (then much embarrassed for money), when the mortgage was given.

*Held*, on a bill by him to foreclose, that he was to be taken as an innocent holder for value; and that on the distinction recognized by the law between a representation of existing facts, and a representation of facts yet to come into existence—the distinction between "promissory statements" based upon general knowledge, information, and judgment, and those representations which, from knowledge peculiarly his own, a party may certainly know will prove to be true or false—he was entitled to a decree.

APPEAL from the Circuit Court for the Northern District of Illinois.

Ephraim Sawyer filed a bill in the court below against Henry Prickett and wife, to foreclose a mortgage given by them, on the 1st of September, 1857, to the Fox River Valley Railroad Company, to secure the payment of a note for $2000 at ten years from its date, and by the company assigned to him, the complainant. The answer set up as a defence, that at the date mentioned Prickett gave the note described to secure the payment of a subscription to the stock of the railroad company mentioned, and that this subscription was obtained by fraud and deceit; and so that the note and the mortgage were void.

The fraud and deceit alleged consisted in the following matters which the answer stated, to wit, that two persons, one Conover and a certain W. G. Parsons, of Milwaukee, in Wisconsin, as agents of the company, and John Sibley and W. A. McConnell, residents of Richmond, in Illinois, caused it to be understood that a railroad had been incorporated to extend from Richmond to Milwaukee aforesaid, and "that the said parties above named, for the purpose of inducing the property-owners in Richmond and its vicinity to take an interest in the road, and to subscribe for the stock of the company, resorted to fraudulent and deceitful artifices and representations; that they caused a subscription-book for the taking of subscriptions to the stock to be prepared and opened at Richmond; that they caused McConnell, a man of large means, and one in whom the

citizens of Richmond and its vicinity had confidence as a man of integrity and good judgment, and of prudent and sagacious management of business, to head such subscription list, as a subscriber to the stock, to the amount of $1500; that for the same fraudulent purpose they caused one John Woodell, a citizen of Richmond, and a man at that time of considerable means and of good business reputation, to appear in the subscription list as a subscriber to the stock to the amount of $1000, and, also for the same purpose, caused it to be represented and believed among the residents of Richmond and its vicinity that the said John Sibley (already mentioned), a person at that time of means and large influence in that community, and of integrity, had subscribed largely to the stock; and further, that the railroad, when constructed, would greatly enhance the real estate and other property in Richmond and its vicinity by furnishing a market in Milwaukee for the farm products raised in the vicinity of Richmond, and that the said market, especially for the sale of wheat, would be much more advantageous to the farming community of Richmond than the market which they now had at Chicago.

That the said parties publicly represented, and caused it to be believed by the residents and property-owners of Richmond and its vicinity, that the company would pay large dividends upon its stock; that farmers and parties owning real estate could become the owners of so much of the stock as they should subscribe for, by giving their notes for the amount so subscribed to the company on long time and drawing interest at 8 per cent. per annum, and securing the notes by mortgage upon their farms or other real estate; that the company would promptly pay all the interest upon said notes so given, as the same should mature, out of the dividends that would from time to time be declared upon the stock of the company, and that the balance of the dividends, after the payment of the interest, would be amply sufficient to pay the principal of the notes when the same should become due.

That, in this manner and by these means, the said parties

aroused and caused a great interest and unusual excitement among the citizens, residents, and property-holders of Richmond and its vicinity regarding the railroad, and that large numbers of them, relying upon the flattering representations made, as aforesaid, were prevailed upon to subscribe to the stock of the company; that the defendant was among those who, by the means, in the manner, and upon the representations made, as. aforesaid, became and was interested in said railroad project; and that after he had thus become informed thereof, and of the general features of the railroad project, as hereinbefore set forth, and had become greatly excited on account thereof, a short time prior to the said 1st of September, A. D. 1857, the said Conover and Sibley represented to him that the company was duly incorporated and fully organized, and that it would construct and equip the road and have the same in full and complete operation within *one year* from the date last aforesaid; that the railroad, when constructed, would greatly enhance the value of the defendant's real estate, by furnishing better market facilities, as hereinbefore stated; that the defendant would not be required to pay any money for the stock so subscribed for by him, but that the company would take in lieu of such money his note, payable in ten years from date, with interest thereon at 8 per cent. per annum, secured by a mortgage of the land owned by him; that the railroad would earn large dividends, and that the company would pay the interest upon the note as it should mature, and that, with the excess of dividends, the company would be amply able to pay the principal of the note when it should become due.

The answer averred also that the defendant reposed confidence in these flattering statements, and relying upon the promise given, subscribed for $2000 of the capital stock of the said company, and gave the note and mortgage in suit to secure the payment of the same.

It further averred that the Fox River Valley Railroad Company was never incorporated; that no part of it had ever been built; that it had been given up and abandoned; that McConnell, Woodell, and Sibley were not subscribers

for stock as was represented, or that their subscriptions were upon a secret agreement that they should stand upon the books for larger sums than were actually subscribed by them; that McConnell, appearing as a subscriber for $1500, should only be bound for $500; and that Woodell appearing as a subscriber for $1000 should only be bound for $500; and that Sibley never subscribed for any amount of stock, and never gave his note and mortgage as was represented.

It further averred that these misrepresentations were made with an intent to defraud; that the complainant was not a *bonâ fide* holder of the note and mortgage, but was himself one of the projectors and managers of the fraudulent contrivance, and well knew all of the facts alleged before he became the owner of the instruments.

Replication being made, testimony was taken. Sawyer, Prickett, McConnell, Sibley, and Woodell were all examined as witnesses.

From the testimony the facts of the case appeared to be thus:

The town of Richmond was a small place, close to the north line of Illinois, and between Milwaukee on the north of it (about fifty miles off), and Chicago, on its south, at a greater distance. It had a railroad connection, through the railroad of the Fox River Railroad Company of *Illinois*, with Chicago, but none with Milwaukee.

In this state of things the Fox River Railroad Company of *Wisconsin* was incorporated in Wisconsin, to connect by a prolongation of the Illinois road Richmond and Milwaukee; Milwaukee being the place where the organization of the latter company was had and the place from which its affairs were managed.

The charter being obtained and the company organized as early at least as 1854, efforts were put in action to build the road. Prior to 1856, the subscriptions to the capital stock coming in slowly, ready funds were short. In 1855 or 1856, Sawyer, then a director with other directors, lent the road money. The work was still going on. And in the autumn of 1857—there being still stock unsubscribed for—a com-

mittee, on which was Conover, then a director and lately before president of the company, and Parsons, at one time its secretary but now its "stock agent," were appointed to go to different villages along the line of the projected road to procure subscriptions for the stock yet untaken. Among other places to which they went was Richmond. Here they got up meetings, got speakers to come and address the citizens, and publicly and privately represented the great benefit that it would be to the farming community to have the road; that the Milwaukee market would give five cents a bushel for wheat more than the Chicago; that stock in the road would *probably* pay thirty per cent. dividend, and be a fine investment for the farmers to make; that if they would take stock they could take it by giving a mortgage running ten years at eight per cent. interest, payable annually; that the company was willing to pay the interest; that the person giving the mortgage would not be called upon for the interest; and that if they would let the dividends of the road remain in the company's hand, in ten years, or before, the dividends would pay for the stock and perhaps more, and then that the farmer would have his stock clear.

The matter was thus summed up by McConnell, one witness in the case:

"They made some very fine speeches, and told what they would do for us if we would sign for stock; and told us a great many things, and those statements induced the people to subscribe."

At one of these town meetings in Richmond, a committee composed of McConnell, Sibley, and some other persons, was appointed to solicit subscriptions.

McConnell, who was regarded as one of the most judicious men of Richmond, headed the list with a subscription for $1500 of the stock; but he did not actually give a mortgage on his property, though he was bound to do so when called on by the company to do it.

McConnell, Sibley, and other citizens of Richmond, then went about at different times for a few days, while Conover and Parsons remained at Richmond to get subscriptions.

Among the farmers in the neighborhood of Richmond was Prickett; he had already met Conover in the town. Prickett's own account of the matter was thus:

"I own the real estate described in the bill of complaint, and have owned it for twenty-one years; it is now occupied by me as the residence of myself and family, and has been so occupied by me as a residence and homestead for twenty years, and during that time I have worked the farm.

"The first that I saw of Conover was in the village of Richmond. He and a number of citizens were together; they thought the property would be enhanced by having a railroad; they came to me and wanted me to subscribe. The first time that they came to me, I told them I would not have anything to do with it. Afterwards I did sign the subscription list, and *they* represented to me that I should never have anything to pay; that *they* would pay the interest, and that the dividends upon the road would pay the principal; that at the time the mortgage ran out, I should be ahead. A short time after that they came to my house, Mr. Parsons with the squire, to acknowledge the mortgage, and my wife held out about signing it half an hour, I should think. They talked to her and told her it would be an everlasting benefit to her to sign it, and that the railroad would probably make thirty per cent., and it would give her and her family $600 a year always. Mr. Sibley and this Conover were the two principal agents in getting subscriptions, and when they came to get the mortgage this Mr. Parsons came with the squire, in order to induce us farmers to subscribe to the subscription list. Conover said the rolling stock would be on *in eighteen months.* They got Mr. McConnell, a leading citizen, to sign. They used every means they could to induce persons to become subscribers to the stock. They represented that the road would be a good thing; that it would bring us a better price for our produce, enhance the value of our property, and that we should never have anything to pay for it—the dividends would pay the interest, and they would pay the principal; they held meetings and got up a great excitement. *The influence was principally exerted by some of our own citizens*—Mr. McConnell, Mr. Sibley, and some others in whom we had the utmost confidence. We thought that if they took stock we could take it too. Mr. Sibley, a citizen in whom we

placed the utmost confidence, said he had mortgaged his house and lot, and that it would be a good thing; induced me in every way to sign, and others; it is not necessary to mention their names. Dr. Stone, Dr. Bennett, and some others I did not attend any of the meetings held for the purpose of obtaining subscriptions."

The following question was asked of the complainant on his examination as a witness:

"Would you have become a subscriber to the capital stock of this company except from the fact that Mr. McConnell became a subscriber thereto, and the other parties you have named?"

To this he answered:

"If they had not represented as they did, and if McConnell and other leading citizens of the town had not subscribed, I certainly should not; but the representation was an inducement to make farmers subscribe, 'See here, you put in $2000 and you get $600 for life. Is not that enough?'"

*Cross-Examination.*

"*Question.* You say in your direct examination 'the influence was principally exerted by some of our own citizens, Mr. McConnell, Mr. Sibley, and some others in whom we had the utmost confidence.' Do you mean by that that you were influenced by Mr. McConnell and Mr. Sibley to subscribe for this stock?

"*Answer.* By Mr. Sibley, more particularly. *He pictured it out so nice to me that he had a great influence on me to take stock.*

"*Question.* Did you see Mr. Sibley on the day on which you subscribed for this stock?

"*Answer.* No. It was some time before that; almost every day he was exerting himself in the matter."

Parsons, it appeared, was a witness to the mortgage; the wife executing it by a cross or mark.

*McConnell* testified that in the autumn of 1857 he subscribed for $1500 worth of stock, agreeing to give a mortgage at ten years, on the plan already mentioned; but that in the spring of 1858 the intended subscription by mortgage was converted into a cash subscription of $1200, "a square

trade," he receiving only twelve shares of stock; that he was never an agent for the company, nor received a cent from it.

*Sibley* testified that at the solicitation of the town meeting —of the citizens, and not at all of the company—he had gone out, as a private citizen, for about a day and a half, having then leisure, and solicited subscriptions; that at other times when going backwards and forwards, to and from the village, which was seldom, if he met a man who he thought was interested, he would ask him to take stock; that he dropped the whole matter within three weeks; that he had never asked Prickett to subscribe or even knew that he had subscribed; that he had never himself subscribed for any stock in the Fox River Railroad Company, incorporated by *Wisconsin;* and had never represented to Prickett or to any one that he had; that he told to different people (as the fact was) that he had taken $500 worth of stock in the Fox River Railroad Company incorporated by *Illinois;* and that "it was fair for them to subscribe for stock in the Wisconsin road, as this was a continuation of the Illinois road."

*Sawyer* testified that he was director of the road in 1855 and 1856, but not after the last year; that after that time he "had been kind of out one side, and proposed to keep away;" that in the summer of 1854 he had solicited subscriptions, and had for one day been with the agents of the company, and saw how they got them; that "there was an understanding that the company would pay the interest so long as *it* kept the mortgages, but if transferred it would be no defence after they passed into a third person's hands;" that he was a subscriber to the stock, $500 cash, $5000 mortgage, which last he cashed at eighty per cent. In addition to this, that in 1855 or 1856—while he, Sawyer, was a director—the company getting into straits for money, he, "with some of the other directors," had lent to it their individual notes, which they had themselves to take up; that they had taken them up, he, Sawyer, to the amount of $10,000; that he and the other lenders then sent their

attorney up to see what securities he could get, to do the best he could, and that he got for all parties in common, certain mortgages, which, like that of Prickett's, had been given for stock; and that that of Prickett's had fallen to his, Sawyer's, lot in the division, the claims on the company being released.

*Woodell,* who it was alleged in the bill had subscribed for $1000 worth of stock, with an understanding that he should really be bound to take but $500 worth, was not examined. He had left Richmond, and was said to live in Iowa. One witness said that Woodell had *told* him this, but there the matter rested.

The railroad company had undoubtedly been incorporated both in Illinois and Wisconsin. About $150,000, raised partly from cash subscriptions, but much more largely by farm mortgages, passed off to contractors at par, or sold to others at eighty per cent. and like great rates of discount, had been expended on the road. It had been graded, but by 1859 the company formed to make it found itself so entirely without money that it could do nothing more then, and in that year the further construction was stopped, though the project was not entirely abandoned as desperate.

At the time when Prickett gave the mortgage, Parsons, the stock agent, gave to him two papers, thus:

"Whereas, Henry Prickett, obligor, has executed a note and mortgage in favor of the Fox River Valley Railroad Company, a body corporate, created by the laws of the State of Wisconsin, bearing date on the first day of September, A.D. 1857, payable in ten years from the first day of September, A.D. 1857, for the sum of $2000, with interest annually at the rate of 8 per centum per annum, from and after the said first day of September, A.D. 1857. And whereas said note and mortgage have been received in payment of twenty shares of the capital stock in said company. Now, therefore, in consideration of the relinquishment and assignment, by the said obligor to the said company, of so much of the dividends on said stock which he may become entitled to as shall be sufficient to pay the interest on said note, the said company agree not to demand said interest from him,

and in case said note and mortgage shall be negotiated by said company, then said company agree to save him harmless from said interest. And the said obligor hereby assigns to the said company so much of any dividend to which he may become entitled on said shares as shall be sufficient to pay off said interest, and agree to pay said principal sum when the same shall become due.

"And it is further understood that this agreement of the said company to relinquish said interest, or to secure the said obligor harmless therefrom, *shall not be a defence on his part against the payment of such interest, if said note and mortgage shall be in the hands of a third-party as security or otherwise.* Nevertheless said company will at all times punctually pay and discharge the same.

"In witness whereof the board of directors of said company have caused these presents to be signed by their duly constituted secretary, and the said obligor has also set his hand and seal, on this first day of September, A. D. 1857.

"C. H. MILLER,

Secretary.

[SEAL.]            "HENRY PRICKETT."

"STOCK CERTIFICATE.

"*To the Secretary of the Fox River Valley Railroad Company of Wisconsin.*

"SIR: This is to certify that Mr. Henry Prickett, of McHenry County, Illinois, is entitled to a certificate of twenty shares of the capital stock of the Fox River Valley Railroad Company, he having executed a mortgage for the same to this company, provided the property described in said mortgage is free from other incumbrances.

"W. G. PARSONS,

Stock Agent.

"September 1st, 1857."

The court below dismissed the bill for foreclosure, and the complainant brought the case here.

*Mr. M. H. Carpenter, for the appellant,* contended that none of the material allegations of the answer were proved, and that most of them were disproved.

That as to what was said at public meetings, or even the

flattering prospects held out at any time, however improper they might have been, prudentially considered, to have been made, they constituted no bar to the foreclosure prayed for; that many of them were not made in the hearing of Prickett; that many were not made by agents of the company; that those which were made to him and by agents of the company were representations of the parties' opinions, or belief, or expectations—or mere predictions—as to the increase of everybody's property about Richmond, in case the road should be made; matters, therefore, not in the nature of representations of *existing facts*, but matters of speculation and matters about which Prickett could form his own judgment independently of the parties expressing their anticipations.

That, however the case might stand as between Prickett and the road, it was plain that Sawyer was an assignee *bonâ fide* and for value of the mortgage, and that by a formal instrument, executed in writing at the same time when the mortgage was given, Prickett had bound himself to pay it to any such holder.

*Mr. T. G. Frost, contra:*

1. We concede that in an ordinary case—a case where a man having no knowledge of facts more than another with whom he deals—standing in no position of superiority or confidence to him—expresses simply his anticipations—merely *prophecies*—in such case the failure of the anticipations, the error of the prophecies, cannot be set up by the other party to relieve himself of the consequences of a contract by him fairly and deliberately entered into.

But that is not this case. Here directors of a road, greatly embarrassed—for before 1857 Sawyer, with other directors, had been compelled to advance their private credit to the road—these directors send out persons as their agents to farms and country villages to get subscriptions. A "stock agent" attends the party. All of the persons sent know perfectly well that the road had been organized long before, and that it had no money, but was insolvent. With this

knowledge they go among poor farmers; they conceal its real condition; they intentionally produce upon the minds of the parties of whom they solicit subscriptions and mortgages to build the road, the false impression that the company was able soon to build and would soon build the road, and that soon it would be in full operation. This fact they must have known was false.

Then it must be constantly kept in remembrance that the men making these representations were sharp, intelligent men of business, coming from Milwaukee, the seat of knowledge, thoroughly informed about everything, dealing with a poor and confiding farmer and his wife, representing to him and her that which they knew that neither of them could, in the nature of things, have any information about.

The relation in which such men as Conover, and Parsons, and the other persons coming from Milwaukee stood in relation to such people as Prickett and his wife, was a confidential relation, as every relation is when a person ignorant of facts, not highly intelligent, and in a walk of life where everything like suspicion is disarmed, is approached by an imposing, practiced man of business, from a city, thoroughly conversant with the matter on which he is bent. In the hands of such men as came after them from Milwaukee, Prickett and his wife were in the view of equity not much better than children. She, it seems, could not write. She signed the mortgage by a mark.

Sibley denies that he made the representations which Prickett swears that he did make. The matter is unimportant. Parsons is a witness to the mortgage. *He* may have made them. If so, the company is more immediately connected with them, for he was its "stock agent." That the representations were made is not doubted; that they operated to decoy and to deceive is certain. The company was the *causa causans*, the cause *causative*, of them all. *It* sent its agents to Richmond. Those agents got up the meetings, and those agents originated, directed, and carried on, directly or through instruments, all that was done.

In short, the entire scheme of obtaining these subscrip-

tions and mortgages was an immoral proceeding, and one which equity must look at with disgust. The concealment of the real facts in the case, and the real condition of the company, and of the real purpose for which the mortgages were obtained, and the representations made (*necessarily implying* the sound fiscal condition of the company and its ability to soon complete the road, and exciting by fraudulent means unfounded hopes in the minds of the subscribers of large pecuniary benefits to accrue from their subscriptions), present a case of fraud practiced upon unwitting victims, entirely ignorant of the real truth of the matter and of the real purpose and design of these directors; one which, had the subscribers known it, would have prevented these subscriptions from being taken and the mortgages from being executed.

2. *The complainant is not an innocent holder.* He had been a long time intimately connected with the road as a director, a creditor, and an agent. He had himself solicited subscriptions; he knew how these farm mortgages were got and what was the expectation of the farmers giving them; he knew it not only by what was notorious in the whole region, but by his own direct communication, observation, and knowledge. After 1856, indeed, he kept a "*kind* of out" of the directorship—"one side"—and "*proposed* to keep away." No doubt he did. He was now a large creditor and vitally interested. He made others his instruments. He was careful not to be a director in form; while obviously one in reality. Finally, when the other directors have got the mortgages, a division is made, contractors get some, and the money-lenders the rest. What is it to the purpose that Sawyer did not solicit *this* mortgage? and that *it* was got *after* he had stopped his solicitations. He took what other directors got, and they doubtless took what he got. That which is to the purpose is, that in 1855 and 1856 the road was greatly embarrassed; that Sawyer and other directors lent it money; that soon afterwards these mortgages were taken, and that *now* they are found in the hands of Sawyer and these directors, Sawyer seeking to foreclose the one which

came to him. The whole case is one—we repeat it—on which a chancellor will look with reprobation.

3. *There was an entire failure of consideration for which the note and mortgage in question were executed.*

The actual consideration for which the note and mortgage were given was in the circumstances and upon the representations that accompanied their execution—a railroad from Richmond to Milwaukee, to be very soon fully completed and equipped, and in running order, giving increased value to the lands of the subscribers, and bringing in a large annual revenue upon their stock, and reimbursing them to the full extent of their subscriptions. Instead of this they received absolutely nothing for their subscriptions. No road was ever built, nor was any road really expected to be built by the parties procuring the subscriptions. As soon as the mortgages were got in, little or no further work was done upon the road. The entire enterprise was abandoned from that time forward. The company was all the time hopelessly insolvent.

Mr. Justice HUNT delivered the opinion of the court.

The law gives a different effect to a representation of existing facts, from that given to a representation of facts to come into existence. To make a false representation the subject of an indictment, or of an action, two things are generally necessary, viz., that it should be a statement likely to impose upon one exercising common prudence and caution, and that it should be the statement of an existing fact. A promissory statement is not, ordinarily, the subject either of an indictment or of an action.* The law also gives a different effect to those promissory statements based upon general knowledge, information, and judgment, and those representations which, from knowledge peculiarly his own, a party may certainly know, will prove to be true or false. It becomes necessary to classify, to some extent, the representations alleged to have been made in the present case.

* People v. Williams, 4 Hill, 9; Roscoe on Criminal Evidence, 362; Ranney v. The People, 22 New York, 413.

1st. The facts alleged to have been represented as actually existing, but which it is said did not exist, are the following, viz., that the Fox River Railroad Company was an organized incorporation; that McConnell appeared as a subscriber for stock to the amount of $1500, when, by secret agreement with the company, he was a subscriber for $500 only; that one Woodell stood in the same position, giving the amounts; that one Sibley had become a subscriber for stock, and given his note and mortgage for the same, the amount not being specified; and that Conover represented himself as one of the officers of the company.

2d. The promissory representations, as might be expected, cover a larger space. Thus it is said to have been represented, that the farms and lands of the contributors would be greatly enhanced in value; that the wheat market of Milwaukee was a better market than that of Chicago, and that they would be able to command five cents more per bushel for their wheat after the road should be built; also that the road should be constructed and equipped within one year; also that the company would pay large dividends upon its capital stock; that where farmers and others became subscribers for stock, and gave their mortgages for the same on long time, drawing eight per cent. interest, that the company, from its dividends, would pay the interest on such notes, and that the balance of the dividends, after paying the interest, would be sufficient to pay the principal of the said notes when the same should become payable; and the defendant testifies that it was represented to his wife that it would be an everlasting benefit to her to sign the mortgage; that the railroad would probably make thirty per cent., and that it would give her and her family six hundred dollars a year always.

It is scarcely credible that Prickett should have believed that the persons making representations like these, intended to bind themselves to their fulfilment. That Prickett may have believed the prophecies, is possible; that he may have understood the makers to believe them is possible, as it is possible the makers did believe them. But that Prickett

believed the makers to have undertaken for the accomplishment of the results promised, is not to be believed. It is contradicted by all the facts in the case. A man of common intelligence, or of ordinary prudence and caution could not have so believed.

He did not ask that they should enter into such engagements. He did not stipulate that his obligation to pay his note and mortgage should depend upon the realization of the rich promises made to him. On the contrary he made his subscription, gave his note and mortgage to secure its payment, and relied upon the success of the enterprise to indemnify and to enrich him. If there were dividends to pay the interest, he would not be required to pay it. If there were dividends applicable to the payment of the principal, the principal would also be discharged. If there were no dividends, or dividends to pay a portion only of his obligation, he must have known and understood that he had pledged his farm to the payment of the residue. If his present theory is correct, instead of giving security to them, Prickett should have required a bond and mortgage from the company, as the actual responsibility for results would rest on the company alone. We are satisfied that such representations, if made, were not relied upon by Prickett; that they did not form the inducement and consideration of his subscription.

This view is sustained by the additional writing made at the time the note and mortgage were executed. That paper recites the execution of the note and mortgage and their receipt in payment of the stock subscription; it stipulates that so much of the dividends of the stock as shall be sufficient to pay the interest on the note and mortgage is relinquished to the company, the company agreeing not to demand the interest, but to save Prickett harmless from the same. This would be well enough except for the two agreements immediately following in the same paper, viz., that Prickett undertakes in any event to pay the principal when it matures, and that the provision in relation to interest shall not be a defence on the part of Prickett to the pay-

ment of the interest, if the note or mortgage shall be in the hands of a third party, either as security or otherwise. So long as he bound himself, at all hazards, to pay the principal, and to pay the interest if the company should transfer the note, it is impossible to credit the theory that he relied upon the alleged promises and expectations as statements which the makers bound themselves to make good to him.

It is alleged that the representation was made that the road should be constructed and equipped, and in full operation, within one year from the date of the giving of the note and mortgage. Such a promise by parties having the means of knowledge of its falsity, from their position as managers and directors of a railroad, might in law stand upon a different basis. We do not examine this point, as there is no evidence of such statement by any one professing to have knowledge, or that there was knowledge of its falsity, if made. Prickett testifies that Conover stated that the rolling stock would be on in eighteen months. His allegation in his answer and his evidence do not agree. It is not proved that Conover was authorized to make the statement, or that he did not believe it to be true.

It is difficult to see how an action or a defence can be based upon promissory representations of the character we have considered, and we are of the opinion that they were the expressions of hopes, expectations, and beliefs, and that neither party understood, or had the right to understand, that they were to be received as statements of facts which any one was bound to make good, or upon which the validity of the subscription should depend.

The alleged representation of existing facts requires consideration.

1st. It is stated that it was represented that the railroad in question was duly incorporated and fully organized. The statement, if made, is sustained by the evidence. It appears that the company had a regular charter; that it was organized by the election of directors, the choice of a president and secretary; and that it had expended considerable

amounts of money in grading its road and in purchasing materials for its construction.

2d. It is said that the defendants were influenced by, and were deceived and defrauded by, a pretended subscription for $1500 of the capital stock of the road, made by McConnell, a man of wealth, of prudence, and caution, in whose judgment and discretion great confidence was placed, while in truth, by some secret agreement with the company he was a subscriber for $500 of stock only. The attempted proof of this allegation is a failure. It is proved on the other hand by the officers of the company, and by McConnell himself, that McConnell made a subscription for $1500; that it was a valid, *bonâ fide* subscription; that there was no condition, limitation, or qualification of it by any agreement, secret, or otherwise, and that he settled and arranged it as a subscription for $1500.

3d. It is alleged that one John Woodell subscribed $1000 upon a similar understanding or agreement. There is no proof to sustain the allegation. Prickett says that he has so heard, but that he has no knowledge on the subject.

4th. It is said that the persons obtaining the subscription caused it to be represented that John Sibley, a man of wealth, of integrity, and of influence, had subscribed largely to the capital stock of the company. Prickett testifies that Sibley told him he had mortgaged his house and lot for stock, and that it would be a good thing, and that he and others induced him to sign. In answer to a question by his own counsel, "Would you have become a subscriber to the capital stock of this company, except from the fact that McConnell became a subscriber and the other parties you have named?" he says: "If they had not represented as they did, and if McConnell and other leading citizens of the town had not subscribed, I certainly should not; but the representation was an inducement to make the farmers subscribe." "See here, you put in $2000, and you get $600 for life. Is not that enough?" In effect, he says that he should not have subscribed except that McConnell and the others did so, but it is apparent that the controlling influence was

the idea that if he subscribed for $2000 of the stock he should get a return of $600 for life.

To make this alleged representation a defence to the mortgage we must believe, first, that it was actually made. Prickett says that it was made. Sibley testifies positively that he never made it, that he had subscribed for $500 of stock in a road of Illinois having the same name, with which this was intended to connect, that he told Prickett of that subscription, but that he had never subscribed to stock in this road, and had never so stated to Prickett or to any one. If any statement was made it was more likely to have been made as to the road where he did own stock than to this one.

It must be believed, secondly, that Sibley was the agent of the company by whose acts or declarations they would be bound. Sibley denies any agency or authority, in fact or assumed, and there is no reasonable evidence to the contrary. He states that as a citizen, and one desirous to have the road built, he solicited subscriptions, and that he acted in this capacity only.

And lastly, it must be believed that Prickett relied upon the statement, that it was an inducement to him to become a subscriber. This has been sufficiently illustrated by what has already been said. These are all the allegations of misrepresentations in regard to existing facts. The evidence to sustain them is too weak to justify the decree.

The counsel for the defendants insists further that there has been a failure of consideration, and that a defence on that ground arises. We do not so understand it. The defendant received what he bargained for, to wit, a certificate that he was entitled to twenty shares of the capital stock of the company. He can, so far as the case shows, obtain his formal shares upon presentation of his certificate. The fact that the road is unprofitable, or that it has never been completed, does not entitle one who has paid in his subscription to the capital stock to recover it back, nor does it furnish a justification for a refusal to pay when the subscription has not, in fact, been paid. Moneys so paid or subscribed belong to the creditors of the corporation.

Nor does a defence arise from the separate paper in relation to the non-payment of interest, which has been before referred to. The paper expressly provides that it shall furnish no defence to the payment of interest if the note and mortgage shall be transferred to another party. It is the personal, separate undertaking of the company to save him (Prickett) harmless from the ultimate payment of interest, leaving Prickett to pay the interest if the security shall be transferred, and to resort to the company for reimbursement. The paper does not require that there should be an absolute transfer of the interest and title to the mortgage to cut off the defence. A transfer conditionally, or as security, is sufficient.

We see no reason, however, to doubt that the plaintiff is a *bonâ fide* holder. He paid a portion of the amount of the mortgage in money, and cancelled a valid debt against the company for the residue. He had no notice of any defence to the note, and received the note before its maturity. Under the rulings of this court it is not necessary to constitute a *bonâ fide* holding that the value should have been paid at the time of receiving the security. A past consideration is sufficient.*

We have recently decided that the rule of *bonâ fide* holding applies to a case where the proceeding is to foreclose a mortgage accompanying a note, with the same force as when the suit is brought upon the note itself.†

The plaintiff had not been a director for some time previously to the taking of this mortgage, and had no part in getting up this or the other mortgages. The proof shows a large expenditure in grading and preparing, and in the purchase of materials, after the giving of this mortgage. For what reason the enterprise failed does not appear. There is no evidence of fraud or bad faith.

The defendant's position is an unfortunate one, but we do

---

* Swift *v.* Tyson, 16 Peters, 1; Goodman *v.* Simonds, 20 Howard, 343.

† Carpenter *v.* Longan, 16 Wallace, 271.

not discover any principle upon which he can justly avoid the payment of his mortgage.

DECREE REVERSED, and the cause

REMANDED FOR FURTHER PROCEEDINGS.