## CURRAN et al. v. SMITH et al.

(Circuit Court of Appeals, Third Circuit. May 28, 1906.)

### No. 44.

**1. CONTRACTS—ACTION FOR BREACH—DEFENSES.**

Defendants, who were contracting engineers, entered into a provisional agreement with plaintiffs to investigate a project for the construction of a pipe line in California to supply water to a city and for irrigating purposes as set forth in a prospectus furnished by plaintiffs, and if found satisfactory to enter into a contract to construct the line and reservoir for a certain sum and a share of the stock of a corporation to be organized and to which the property was to be conveyed. One of defendants spent a month in personally investigating the proposed line, water supply, etc., with full opportunity to learn all of the facts as fully as they were known to plaintiffs. Afterward they entered into a final contract, the property and rights of way which had been secured by plaintiffs were conveyed to them, and they entered upon the preliminary work, but soon abandoned it and refused to proceed further. *Held*, that they could not defend against liability on the contract on the ground that it was induced by fraudulent representations.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts, §§ 424–427.]

**2. DAMAGES—BREACH OF CONTRACT—ANTICIPATED PROFITS.**

Plaintiffs and defendants entered into a contract which contemplated the construction of a pipe line to supply water to a city and for irrigating purposes. Defendants were to construct the line and reservoir and were to receive in payment $110,000 from plaintiffs and one-half the stock of a corporation to be formed, and to which the property was to be conveyed; plaintiffs to retain the remainder. Preliminary surveys and measurements developed the fact that the cost of the line would be largely in excess of the estimates, and that the water supply was far less, and defendants abandoned the contract, and the project was never carried out. *Held* that, in an action for the breach, plaintiffs were not entitled to recover for anticipated profits which under the evidence were too uncertain, speculative, and doubtful, nor for expenditures made by them in connection with the project prior to the contract; but that the measure of damages was the amount expended by them in reliance upon the contract after it was made and before its final abandonment.

[Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Damages, §§ 74–76.]

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

J. Rodgers McCreery, for appellants.

E. W. Smith, for appellees.

PER CURIAM. This case was heard without a jury, and no objection is made in this court, if any objection were now available, to the findings of fact by the learned circuit judge. Upon these findings, it seems clear to us that his conclusions of law inevitably follow, and we think it superfluous to restate in other language a course of reasoning with which we are in full accord.

The findings of fact, as originally found, are as follows:

"This is an action for damages for breach of a contract, brought by Henry B. Smith and William L. Benham, of Bay City, Mich., against Orville P. Curran, Jr., and Curtis G. Hussey, of Pittsburg, Pa.; the parties so named being

citizens of the respective states in which they reside. The defendants deny their liability, on the ground that the contract was procured by misrepresentation, and they also dispute the damages which the plaintiffs claim. The case is submitted to the court without a jury, on the evidence introduced at a previous trial, at which the jury disagreed and were discharged, from which the facts are found to be as follows:

"(1) In 1894 one J. A. Jones conceived the idea of obtaining a water supply at the head waters of the San Luis Rey river, at the foothills of the San Jacinto Range, Cal., some 20 odd miles back from the ocean, and furnishing water for purposes of irrigation in the San Luis Rey Valley, and to the city of Oceanside at the coast. The stream referred to is not a large one, and not only was the water which flowed upon the surface to be utilized, but underground percolations, which exist and are available in that region by reason of the character of the soil, were to be developed and brought to the surface by means of driven wells. The supply so obtained was to be conducted by means of a gravity pipe line, from the proposed head above Pala, to a distributing reservoir at Oceanside, a distance of 22 or 23 miles; water for irrigating purposes being taken off for farms and ranches at various intermediate points. In the development of the scheme, and in order to give it a substantial basis, a contract was secured with the city of Oceanside by which, in consideration of the delivery of 100 miner's inches of water, the city was to pay $25,000 in cash when the pipe line was completed, and an annual rental thereafter of $2,500. A contract with a large ranch owner named McWhirter was also secured, who was to pay $37,500 cash and $3,750 annual rental, in return for 150 inches of water; and there was an understanding with another ranch owner named Utt, that he would pay $28,500 and $2,850 rent, for 114 inches. Some 82 different farmers along the line further agreed to pay an aggregate of $26,625 cash, on completion of the work, and an annual rent of $5,700, in return for 228 inches of water, and were in addition to contribute 1,242 acres of land, which it was estimated would be worth when irrigated about $100 per acre. A tract of 120 acres was also purchased by Jones, at the point where the stream breaks through the foothills, for the beginning of the pipe line; and, the prospective course of the line having been staked out, a right of way over public highways was secured from the commissioners of San Diego county in which the San Luis Rey Valley is situated, and arrangements for it were made over private lands which would be crossed for a large portion of the distance. Some landowners at the upper end, however, did not give their assent.

"(2) In the latter part of the same year (1894) Jones brought the project to the attention of the plaintiffs, Smith and Benham, one of whom was a manufacturer of wooden pipe and lumber, and the other assistant general freight agent of the Michigan Central Railroad. They in turn consulted R. P. Lamont, an engineer of Chicago, who became interested in the scheme, and, after having gone out to Oceanside to look it over, gave it as his opinion that a line could be built for about $100,000, of which $60,000 would be required in the first six months; the money from the sale of water rights taking care of the enterprise after that. Later on, through Lamont, the plaintiffs were introduced to the defendants, Curran and Hussey, who were contracting engineers; Lamont and Curran having been previously associated together in business. And on October 31, 1895, the parties met together at Pittsburg, where the project was fully discussed; the following prospectus being submitted by the plaintiffs in that connection: 'Capacity of pipe line, over 3,000 inches (miners') daily. Water sells from $250 to $500 per inch. Annual rental $25 to $50 per inch, making over $100,000 per annum for life of pipe line, over the following property secured: 120 acres at head of pipe line, with flowing stream at all times of the year; also flowing wells—good pure water. Filing of 5,000 miners' inches from river first right. Natural reservoir, capacity ten billions gallons of water. Right of way from county commissioners. Right of way from property owners full length of line. Contracts already signed, giving first mtgs. on real estate for water for over $100,000. Pipe line about 22 miles in length—gradual descent—760 feet fall. Large amount of land covered as plan of construction, viz., inclosed pipe 36 inches laid on skids, natural flow, reach all land not higher than head and can

follow lay of land. This allows of land being irrigated entire length of line instead of at end of pipe line, as when water is carried in ditches. Location San Luis Rey Valley, Oceanside, San Diego County, Cal. End of line, have contract with city for $25,000, 100 inches.' Attached to this prospectus was a list of those who were said to have contracted for water, with the number of inches to be taken by each, and the quantity of land they were respectively willing to contribute, the written contracts for which, it was understood, were held in escrow by E. S. Payne, a banker at Oceanside, pending the carrying out of the project. The result of this interview was a preliminary or provisional agreement, a copy of which is set forth in the plaintiffs' statement, and made part of these findings, by which the defendant, in substance, undertook to investigate the proposed pipe line, and if it appeared that the cost would not exceed $100,000, and that the contracts, water rights, and privileges, including that with the city of Oceanside, had the value represented by the plaintiffs, to enter into a contract to build the line for the sum named, as soon as a charter for an irrigating company had been procured by the plaintiffs under the laws of California; the plaintiffs on their part agreeing to turn over to such company all their rights, privileges, deeds, and contracts, receiving the whole of the capital stock in return, and transferring two-fifths to the defendants, retaining two-fifths for themselves, and holding the other one-fifth for Jones and Lamont.

"(3) Immediately following the execution of this agreement, Curran went out to Oceanside to make investigations, reaching there November 11th, and within the next few days he went twice over the ground with Jones, who pointed out the proposed line cut through the brush and staked, representing it as suitable and as having been the subject of a survey. He was also taken to the head of the line, and shown the stream that was to be utilized, observing and making an estimate of its flow, which he figured at about 300 miners' inches; and the place where the underground waters were to be developed was pointed out, and, in a general way, the lands intended to be irrigated. He was further taken to the Payne bank where the water contracts held in escrow were produced, and the list which he had of them checked off and verified. He was not informed, however, of the fact that a number of these contracts had been canceled at that time, on account of the failure to complete the pipe line by the time set; advantage having been taken by the parties of a provision in each allowing them to do so. In all he remained about a month at Oceanside and vicinity, looking into other water systems, getting estimates on the cost of the work, and busying himself with general matters connected with the scheme. During this time, under the stress of a counter proposition made by other parties—Grant and Puterbaugh—the city councils of Oceanside were also threatening to cancel their contract on the ground that the time fixed for the completion of the work, February 1, 1895, was long since past. Curran at once interested himself to prevent this and try and get an extension, and, for the purpose of doing so, at the instance of Benham, who had also in the meantime come out to Oceanside, a letter was written November 30th, in the name of the defendants, addressed to the plaintiffs, to be used before the councils, wherein it was, in substance, declared that the defendants had investigated the proposed pipe line, and were prepared to enter into a contract for its construction, according to the existing (provisional) agreement between the parties, with a reservation as to the price, which is not important. On the strength of this, on December 10th, a new contract was entered into with the city of Oceanside, in the name of Smith (to whom Jones on December 2d had formerly assigned and transferred all his rights and interests); this contract being to substantially the same effect as before, except that the work was to be completed by July 31, 1896. A bond which was exacted by the councils was further given by Smith, with Benham and Lamont as sureties, in the sum of $15,000 to secure the fulfillment of the undertaking by the time named.

"(4) Having got the measure into this shape Curran returned East, and on December 17th, 1895, the parties met again—this time at Chicago—and entered into the agreement on which suit is brought, a copy of which is set forth in the plaintiff's statement and made part of these findings. It was there, in substance, agreed by the defendants, confirming what had gone before, that,

in accordance with plans and specifications to be by them furnished, and by the plaintiffs approved, they would construct a 36-inch wooden pipe line, from a point on the San Luis Rey river, about three miles above Pala Mission, to the site selected for the reservoir at Oceanside, estimated to be 23 miles; such pipe line to be commenced as soon as convenient and completed by July 31, 1896, and the right of way to be furnished by the plaintiffs as fast as needed. In consideration of this undertaking, the plaintiffs agreed to pay the defendants $105,000 within four months after the completion of the work; this sum being based on an estimated length of line of 23 miles, with provision for a proportionate increase or deduction in case it varied one way or the other therefrom, and with a further provision that the defendants should be paid the actual cost if it exceeded the sum named, up to $110,000 as a limit. The plaintiffs also agreed to organize a corporation under the laws of Illinois, which was the state finally selected, with a capital of $600,000, to which they were to transfer all contracts, rights, and privileges, receiving in return the whole capital stock, and assigning one-half of it fully paid to the defendants as an additional consideration for the pipe line, which later was to become the property of the corporation when completed. There were other elaborate provisions with regard to the financing of the scheme; which do not need to be noted, except that the defendants were to furnish an indemnifying bond of $15,000 to the city of Oceanside to take the place of the one outstanding, on which the plaintiffs were obligated. While nothing is said in the agreement as to Jones and Lamont, it was understood that they were to be taken care of by the plaintiffs out of their one-half of the stock. Following this, on December 2d, Jones, as above noted, transferred to Smith all his rights and contracts, and on December 10th further conveyed to him the 120 acres of land which he had purchased at the head of the line. The former were in turn assigned by Smith to Curran and Hussey, December 26th, and on February 28, 1896, the land was also deeded to them, in trust, however, for the corporation which was to be formed. An order was also given December 18th by Smith on Jones, to turn over to the defendants all construction material and property which he had on hand, which was done.

"(5) After the execution of the final agreement, and some following correspondence between the parties with regard to the formation of the proposed corporation, the organization of which by common consent was deferred for the time, the defendants about the middle of January, 1896, went out to Oceanside to carry out the project. The first thing to be done was to make a survey, in order to definitely locate the line on which the pipe was to be laid, to accomplish which the defendants got together a corps of engineers and put them in the field. It was then for the first time discovered that the only approach to a survey which had been previously made was one by Jones, with an ordinary carpenter's level to determine the grade, and without definite plans or profiles. The defendants' engineers were engaged in their work about six weeks, completing it the middle of March, and making careful and extended surveys and estimates, from which it was ascertained that the cost of constructing the line would far exceed the amount for which the defendants had undertaken it, and that the results to be derived would be very much less than had been represented. It was found, for instance, that the flow of the stream at the proposed intake was 275 miners' inches, and in the opinion of Mr. Miller, the defendants' engineer, nothing beyond that could be developed. I am not prepared to adopt this view, but I do find that enough could not be so obtained to make up the 3,000 miners' inches spoken of in the prospectus, and it is doubtful whether even the 592 inches could be secured which were necessary to meet the outstanding irrigation and other contracts. By going three miles up the stream, however, and developing other branches, a somewhat better showing could be made. There was a serious discrepancy also in the elevations. Instead of there being a gradual fall of 760 feet to work with, the proposed intake was only 475 feet above tide, and the site selected for a reservoir at Oceanside was 280 feet, leaving but 191 feet between the two, although it was possible that the reservoir could be effectively put 100 feet lower. Nor was the fall a gradual one. For some 21 or 22 miles to Gonzales corner (a controlling point if the project of extending the system into Vesta Valley, which seems to have been contemplated, was adhered to) the fall was

approximately but three feet to the mile, which would only be sufficient to deliver 1,100 miners' inches, as a maximum, in a 36-inch pipe. Abandoning, however, the idea of getting over into Vesta, and lowering the Oceanside reservoir as suggested, an average fall of about 10 feet per mile could be secured, which would increase the delivery to about 1,900 inches. Adhering also to the line staked out by Jones, about half way down the course, just south of Gopher Canon, the ground was 40 feet higher than at the starting point, and 75 or 80 feet above a hydraulic grade line of three feet to the mile, necessitating either a tunnel or a heavy cut over a mile long at a great expense. A practical line could be secured, however, which would avoid this difficulty, but would vary about a mile from the one originally proposed, and increase the length of it, a survey and location of which was made. It was further found that the pipe at certain points, instead of being laid at grade, would have to be carried over deep gullies, on high trestles, materially increasing the expense. All things considered, the cost of the line as estimated by Mr. Miller, on the best practical location, was $437,000. As to the farms to be irrigated, with the owners of which contracts had been secured, pledging certain contributions of land and money when the work was completed, it was developed by the survey that about half were higher than the line, and not able therefore to derive any benefit from it, in addition to which, as already stated, a large number of the parties had given notice of forfeiture for failure to complete within the time limited. Difficulties were further experienced with regard to the right of way, particularly at the upper end of the line, where several landowners expressly refused it, at first even forbidding a survey across them. Water rights, for irrigating purposes, were also claimed in the stream, by certain riparian owners below the intake, which if substantiated and insisted upon would seriously cripple the enterprise.

"(6) After expending about $5,000 or $6,000 in these surveys and investigations—or if the value of their own time and services were included, some $7,000 or $8,000—and being convinced as the result that the scheme was impracticable, the defendants so notified the plaintiffs, at an interview in Chicago, April 27, 1896, at which the subject was discussed at length, although no definite conclusion was reached. Afterwards, on May 2d, in order to bring the matter to a head, Mr. Gillett, the plaintiffs' attorney wrote to the defendants, stating that his clients were ready to perform their part of the contract, and insisted that it should be carried out by the defendants, to which the defendants, by Mr. Lord, made reply a few days later that they had not yet fully decided what they would do, and proposed to look into it further. On June 6th, however, they notified the plaintiffs that they did not intend to go on, and on June 24th they offered to return all contracts, rights of way, etc., which had been transferred, but the plaintiffs refused to accept them. Suit was begun in September, 1899, without anything further having passed between the parties. The project which was the basis of the agreement between them has never been proceeded with or developed by the plaintiffs, nor so far as appears, by any other parties, and remains to-day in substantially the same condition as when it was dropped by the defendants."

After these findings were made the defendants moved to add the following:

"(1) That C. P. Curran, Jr., on his trip to Oceanside in November, 1895, was directed by plaintiff to meet J. A. Jones, who was plaintiff's representative on the ground. (2) The plaintiffs, through Benham and Jones, their representative, had knowledge, at and before the time the contract in suit was executed, of the character and extent of the investigations which had been made by Curran, of and in connection with the pipe line. (3) That all of the contracts with landowners for water contained the following provisions, inter alia: '[Landowner] do hereby covenant, contract and agree to and with the said Jones, his associates, successors or assigns, that upon said Jones, his associates, successors or assigns, delivering ―――― miners' inches of water ―――― through one of the conduits of the said system of water works at the property line of the above-described lands within twelve months of the first day of June, 1894, then in such case ―――― do hereby promise, contract, covenant

and agree ——— to pay to said Jones, his associates, successors and assigns, the sum of ——— dollars. Provided, however, and this agreement is made upon the express stipulation, ——— that water shall be furnished by June 1st, 1895, unless the said Jones, his associates, successors or assigns shall be prevented by labor strikes, labor organizations, acts of God, order of court, or other acts or things beyond the control of said Jones, his associates, successors or assigns, and provided further, that on or before June 1st, 1895, said Jones, his associates, successors or assigns shall deliver a contract duly executed according to law, wherein and whereby said Jones, his associates, successors or assigns shall grant to ——— or ——— assigns ——— upon the conditions herein contained, the perpetual right to take,' etc. (4) That defendants were informed by plaintiffs that the underground waters at the point of divertion above Pala had been investigated and that these investigations had disclosed an ample supply of water. (5) Letter from H. M. Gillett to Curran and Hussey, dated May 2, 1896 [testimony, p. 341], and letter of Hamline, Scott and Lord, to H. M. Gillett, dated May 8, 1896 [testimony, p. 344]."

The letters referred to in the fifth request do not appear in the record. The first, third, and fifth requests were granted, and the second and fourth were refused. The learned judge's argument upon the law as it is applicable to these facts, and his conclusions therefrom, appear from the following further quotation from his opinion:

"Taking up first the question of the defendant's liability upon the facts so found, before discussing the subject of damages, it is idle to argue that the agreement is invalid because it was induced by fraudulent misrepresentations on the part of the plaintiffs. However widely divergent the conditions, on which the success of the enterprise depended, are found to be from what was represented in the discussion between the parties leading up to the agreement, the defendants, through Curran who went upon the ground and was given all the information asked for, undertook an independent investigation, after the preliminary or provisional agreement, and before entering into the final one, and by that they are bound. It does not matter that this was not thorough, although a month was given to it, or that it failed to develop the discouraging features which subsequently appeared. Every opportunity was afforded to make it as full as necessary, and there were many things, such as the flow and fall of the stream, the character of the country to be traversed, the distance (which is now complained of as some three miles more than was stated), and the elevation and lay of the land, which were apparent to the observation of any one, and presumptively much better understood and appreciated by the defendants, with their technical engineering training, than by the plaintiffs. There is no pretense, and certainly there is no evidence, that the plaintiffs did not honestly believe and rely upon the representations made in the prospectus, by which they were apparently as much misled as the defendants; their confidence and good faith being shown by the large amount of money which they were prepared to advance. The most that can be said is that they ought to have known with exactness the truth of what was asserted in the prospectus before allowing it to be made the basis of negotiations. But, whatever might have been the result had the matter rested there, the defendants, very properly, before going into a project of this character and magnitude, took time to look into it, and if they failed to inform themselves as fully as they might and ought, not having protected themselves by a warranty, they cannot now be heard to say that the agreement was entered into in reliance upon the representations of the plaintiffs, and that, these having failed, they are relieved.

"The law upon this subject is well settled, as will appear by the reference to a few of the authorities. Thus, in Slaughter v. Gerson, 13 Wall. 379, 20 L. Ed. 627, it is said: 'Where the means of knowledge are equally available to both parties, and the subject of purchase is alike open to inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's misrepresentations. * * * And the same rule obtains when the complaining party does

not rely upon the misrepresentations, but seeks from other parties means of verification of the statements made, and acts upon the information thus obtained.' So in Southern Development Co. v. Silva, 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678, which was a bill to rescind a contract to purchase a mine, it was said: 'Where the purchaser undertakes to make investigations of his own, and the vendor does nothing to prevent his investigation from being as full as he choses to make it, the purchaser cannot afterward allege that the vendor made misrepresentations.' In Farrar v. Churchill, 135 U. S. 609, 10 Sup. Ct. 771, 34 L. Ed. 246, a bill was filed to restrain the enforcement of purchase money due on land, and for a recoupment of damages by reason of false representations with regard to it. The land was a plantation lying along the Mississippi river, and the sale was effected through a real estate agent who delivered to the prospective buyer a written memorandum with regard to the property, wherein it was, among other things, stated that 1,060 acres were under cultivation, and that 800 acres according to the owner, or 500, according to the levee engineer, were 'above overflow,' thereby meaning, above any overflow from the river previously experienced; both of which representations failed. In a letter accepting the property, the purchaser expressly declared that he did so on the statements made as to the amount, character, etc., of the land; but it appeared that prior to this he visited the plantation, with a view to inspecting it before purchasing, and was taken over it from one end to the other by the party in charge, and it was held that he was bound. 'The general principles applicable to cases of fraudulent representations,' says Fuller, C. J., 'are well settled. * * * The representation must be in regard to a material fact, must be false, and must be acted upon by the other party in ignorance of its falsity and with a reasonable belief that it was true. It must be the very ground on which the transaction took place, although it is not necessary that it should have been the sole cause, if it were approximate. immediate, and material. If the purchaser investigates for himself, and nothing is done to prevent his investigation from being as full as he choses. he cannot say that he relied on the vendor's representation.' To the same effect are Farnsworth v. Duffner, 142 U. S. 43, 12 Sup. Ct. 164, 35 L. Ed. 931, and Shappirio v. Goldberg, 192 U. S. 232, 24 Sup. Ct. 259, 48 L. Ed. 419, in the latter of which it is reiterated, that: 'When the means of knowledge are open and at hand, or furnished to the purchaser or his agent, and no effort is made to prevent the party from using them, and especially where the purchaser undertakes examination for himself, he will not be heard to say that he has been deceived to his injury by the misrepresentations of the vendor.' Cases announcing the same doctrine could be almost indefinitely multiplied. but it will be sufficient to refer to Attwood v. Small, 6 Clark & Fin. 232; Jennings v. Broughton, 5 De G. M. & Cord. 126; Haywood v. Cope, 25 Beav. 140; Mahaffey v. Ferguson, 156 Pa. 156, 27 Atl. 21; Tuck v. Downing, 76 Ill. 71; Ludington v. Renick. 7 W. Va. 273; Hall v. Thompson, 1 Smedes & M. (Miss.) 443; Colton v. Stanford, 82 Cal. 351, 23 Pac. 16, 16 Am. St. Rep. 137; Long v. Warren, 68 N. Y. 426. They all with one accord imposed upon a party, who is given opportunity to investigate and undertakes to do so, the responsibility for the result, unless he protects himself by a warranty, or by such subsequent assurances at the time of entering into the contract as amounts to it.

"In the present instance, much that appears in the prospectus consists, not so much in a statement of existing facts, as a representation with regard to things to be brought into existence, as to which, as is said in Sawyer v. Prickett, 19 Wall. 146, 22 L. Ed. 105, the law gives a very different effect; and, as a mere suggestion of possibilities, it is a question how far the defendants in any event had the right to rely upon them. East v. Worthington, 88 Ala. 537, 7 South. 189; Bandurant v. Crawford, 22 Iowa, 40; Sawyer v. Prickett, 19 Wall. 146, 22 L. Ed. 105. But passing that by, even as to those statements which were given a more definite and positive form, the defendants, not only having taken it upon themselves to make an investigation, but expressly agreed to do so, cannot now say, according to the doctrine announced in the cases cited, that they put faith in the representations made by the plaintiffs with regard to the project, however extravagant they have been proved, so as to entitle them to avoid the agreement on the ground of deceit or fraud.

"The defendants therefore being undoubtedly liable on the agreement, the only question is as to the damages which have been sustained by its breach. The principal claim made by the plaintiffs is to the profits which it is said they have lost, which it is contended were large and assured. With regard to this, however, there is considerable to be observed. The scheme which the parties had in contemplation, into which the agreement entered, while not necessarily impracticable, could not, in my judgment, have been realized to the extent anticipated. As is shown above, the supply of water required for any great success was not there, being apparently limited to the possibility of some 500 miners' inches, the elevation of the proposed intake was much less than was calculated, making it difficult to secure a suitable hydraulic grade line, and the cost of construction was likely to far exceed the estimate of $100,000 which had been relied on—all of which correspondingly reduced the probability of remunerative results. ' As their part of the agreement the plaintiffs were to advance, for the construction of the pipe line, the sum of $105,000, which might be increased to $110,000 in case it cost that much, for which they were to receive one-half of the capital stock of the corporation to be formed, of the par value of $300,000 (their share), less such portion as was to be given to Lamont and Jones, which is not shown. Assuming that the defendants are chargeable with the failure of the enterprise, because of the refusal to carry out their part of it—although the scheme is still open, and others can possibly be interested in it on equally favorable terms, if it has merit—the stock which the plaintiffs were to get represents their ultimate interest, and the value of it, less its cost, stands therefore as the measure of their loss, because of the enterprise not having been carried through. This value, however, it is manifest, cannot be determined with any certainty. It is dependent upon the success of the project, which was necessarily problematical, if not doubtful. The most that can be said is that, if the difficulties spoken of above and others which existed were overcome, the corporation, upon the completion of its line, might have expected to receive from the city of Oceanside, and the different ranch owners and farmers with whom contracts had been made, the amounts which they had respectively pledged, including the land that was to be contributed; from which, no doubt, considerable would have been realized. All this was contingent, however, on the ability of the corporation to meet its part of the undertaking, and this 'was dependent upon its developing a water supply of at least 592 inches, which was apparently only in part to be had. It was also dependent—outside of the contract with the city of Oceanside—on how far the lands of those who had been drawn into the scheme could be irrigated, a large part of which undoubtedly could not be, because of their being above the grade of the line. A number of these landowners, moreover, long prior to the breach of the defendants' agreement, had terminated their contracts, availing themselves of their right to do so; the time limited for the completion of the work having expired. And even those who had given no notice had the right to do so for the same reason, at any time. No doubt many, if not all, of these parties could be got back, if the water was ready to deliver; but as the matter stood there was nothing to be relied upon in this direction with any certainty. It is useless to ask for damages therefore, as though the money which was to be paid and the bonus land which was to be contributed was so much cash in hand which the plaintiffs have lost. All that can be said is that these were possible resources which might be realized, and when they were would aid in giving value to the plaintiffs' share in the enterprise, but, until they were, could not be counted on.

"It will be seen from these considerations that the success of the scheme and the results to the plaintiffs in return for the one hundred and odd thousand dollars which they were required to put into it were most uncertain. It is indeed a grave question whether the plaintiffs are not by just so much the better off than if the project had been carried out to the end, having their money instead of having sunk it. But at the most they would have had nothing but their $300,000 of stock, the intrinsic value of which it is altogether impossible to estimate, even approximately. It might have proved valuable. It might have been worthless. No one can say which. Nor, if of value, how much. While it is true that the law does not array itself against the recovery of anticipated profits, by way of damages. 8 Am. & Eng. Encycl.

Law (2d Ed.) 618, 620; Griffin v. Colver, 16 N. Y. 489, 69 Am. Dec. 718; Lazier Gas Engine Co. v. Du Bois, 130 Fed. 834, 65 C. C. A. 172. It does against those which are speculative and doubtful. Iron City Tool Works v. Welisch, 128 Fed. 693, 63 C. C. A. 245; Howard v. Stillman Mfg. Co., 139 U. S. 199, 11 Sup. Ct. 500, 35 L. Ed. 147. And that is the character of those which we have here.

"I therefore find as a matter of fact, as well as of law, that the profits claimed to have been lost by the plaintiffs by the failure of the defendants to perform the agreement in suit were uncertain, speculative, and doubtful, and cannot be allowed.

"The plaintiffs further claim the value of the time and money which they have expended on this project. Directing our attention first to that which preceded the final agreement, I find the facts to be as follows:

"Facts as to Expenditures Preceding Final Agreement. Up to December 17, 1895, the date of the final agreement between the parties, the plaintiffs had expended in endeavoring to promote and develop the project in question, including the value of their own time and services, the sum of $15,238.01, the items of which appear in the exhibit attached to the plaintiffs' statement which is hereby made a part of these findings, as though incorporated therein. On this they were paid by the defendants for supplies and other property turned over to them the sum of $1,985.86, leaving a balance of $13,252.15. This amount included $750 paid for 120 acres of land bought by Jones at the head of the line, which the plaintiffs still own. It also covers $1,860, charged for their own time and services, including meetings with the defendants at Chicago and Pittsburg in negotiating for an agreement. It does not appear that any of it was incurred at the instance or request of the defendants; by far the larger part being before the parties had ever met, and the material which they got out of it having been paid for. Upon what principle these expenditures are claimed it is difficult to see. It is true that the plaintiffs may have invested this much in the project which they will not get back, unless it is revived. But this is not to be laid at the defendants' door. Even if the project had gone on, the plaintiffs would still have been out this money, except as it was made up to them by the profits derived from the venture, if successful, which it would, however, by so much have reduced. There are also particular objections to individual items, such as the $750 paid for the Jones land of which they still have the benefit, and the $1,860 charged for their own time and services, with which the defendants had nothing to do. But, without stopping upon this, taking the expenditures as a whole, upon no consideration do any of them enter into the damages for which the defendants are responsible, and they are therefore disallowed.

"The plaintiffs also claim for expenditures made and obligations incurred after the execution of the agreement, with regard to which the case is different, and as to which I further find:

"Facts as to Expenditures After Execution of Agreement. Since December 17, 1895, when the agreement was executed, the plaintiffs in furtherance of their part of it, and in some instances at the direct suggestion of the defendants, paid out money and became obligated to the extent of $3,630.82, which they would not have done except for the agreement, and of which they have now lost the entire benefit by the failure of the defendants to keep it. The items which make up this sum are set forth in the margin, those which bear date after the breach of the agreement being really incurred before it [table omitted], and they now with interest amount to $5,525.

"Two matters claimed by the plaintiff in this connection, however, do not come within this category—$51.12 attorney fees paid J. L. Stoddard, and $1,966.55, balance claimed by Jones, and one $500 counsel fees in negotiating with defendants, only partly. The Jones claim has not been paid or assumed by the plaintiff, and there is nothing to show how it is made up or that they are obligated for it; much less that it is a matter with which the defendants are chargeable. The same also is substantially true of the attorney and counsel fees, with this exception: There is evidence that Mr. Gillett did some work looking to the organization of a corporation under the Illinois law, which would be the legitimate subject of a charge against the defendants; that duty having been imposed on the plaintiffs by the agreement, and therefore proper-

ly undertaken by them. The value of these services does not appear, but I venture to estimate them at $100, which I allow. The rest of the attorney and counsel fees, covering the negotiating and settling of the provisional and final agreements, as well as legal advice when a breach was imminent, are not a legitimate subject of claim, and are therefore refused.

"As to the indemnifying bond of $15,000, which was given to the city of Oceanside by Smith, with Benham and Lamont as sureties, on account of which damages are also claimed, it will be sufficient to discuss the question of liability when the plaintiffs are shown to have suffered by reason of it. While suit has been threatened, it has gone no further, and, the obligation not being absolute, the mere fact that it is outstanding amounts to nothing until they have been compelled to pay something on account of it. As the result of these conclusions the plaintiffs are entitled to judgment, which is hereby directed to be entered in their favor, in the sum of $5,525, with costs; and the counterclaim of the defendants is denied."

It is therefore ordered that the judgment be affirmed, upon the foregoing opinion.