### MATHER v. BARNES, KEIGHLEY & GREER.

(Circuit Court, W. D. Pennsylvania. August 9, 1906.)

No. 10.

1. VENDOR AND PURCHASER—FRAUDULENT MISREPRESENTATIONS—RESCISSION.
   A misrepresentation with regard to material facts, by which a purchase of property is intentionally induced, amounts to a fraud, which vitiates the transaction and entitles the purchaser to be relieved.
   [Ed. Note.—For cases in point, see vol. 48, Cent. Dig. Vendor and Purchaser, §§ 38–60.]

2. SAME—MEANS OF KNOWLEDGE—DUTY OF PURCHASER.

Where, however, the means of knowledge are at hand, and are equally open to both parties, if the purchaser does not avail himself of them, he will not be heard to say that he has been deceived by the misrepresentations of the vendor, being charged with a knowledge of all that could have been so readily ascertained.

[Ed. Note.—For cases in point, see vol. 48, Cent. Dig. Vendor and Purchaser, §§ 38–60; vol. 23, Cent. Dig. Fraud, §§ 19, 20.]

3. SAME—INDEPENDENT INVESTIGATION BY PURCHASER.

And the same rule obtains where, not resting on the statements of the vendor, he undertakes to make and does make an independent investigation and verification of his own.

[Ed. Note.—For cases in point, see vol. 48, Cent. Dig. Vendor and Purchaser, §§ 38–60; vol. 23, Cent. Dig. Fraud, § 18.]

4. SAME—FRAUD PRACTICED IN COURSE OF INVESTIGATION.

In order, however, to have this effect, the examination must be an untrammeled one; and this is not the case where fraud or concealment is practiced in the course of it, or misrepresentations made which would themselves afford occasion for relief. An examination perverted in this way by the act of the vendor is the same as no examination at all.

[Ed. Note.—For cases in point, see vol. 48, Cent. Dig. Vendor and Purchaser, §§ 38–60; vol. 23, Cent. Dig. Fraud, §§ 17–22.]

5. SAME—VALUE OF BARGAIN IN MATERIAL.

Neither does it matter, if misconduct be proved, that the bargain, even so, was a good one, from which the purchaser is likely to sustain no loss. He is entitled to the bargain which he supposed and was led to believe that he was getting, and is not to be put off with any other, however good.

[Ed. Note.—For cases in point, see vol. 48, Cent. Dig. Vendor and Purchaser, §§ 38–60; vol. 23, Cent. Dig. Fraud, § 24.]

6. SAME—SALE OF MINERAL LAND—QUALIFIED REPRESENTATIONS—"TRADE TALK."

Where, as a part of the negotiations for the sale of coal lands, it was represented by the defendants that the land was underlaid throughout its entire extent with a particular vein of coking coal, for which the plaintiffs were seeking and on which the land was sold, but it was also stated as a qualification that they had not themselves been over the property and were not much acquainted with it, their representations are to be taken as nothing more than the usual commendatory expressions, which, as "trade talk," are accustomed to pass at such a time, and by which, however positive, no one is expected to be bound.

[Ed. Note.—For cases in point, see vol. 48, Cent. Dig. Vendor and Purchaser, §§ 40, 50, 52, 53; vol. 23, Cent. Dig. Fraud, §§ 12–14.]

7. PRINCIPAL AND AGENT—ACTS AND STATEMENTS OF ACCREDITED AGENT.

But the acts of an accredited agent within the apparent scope of his authority are the acts of the principal. Where, therefore, prospective purchasers of coal lands were referred by those who had them for sale to a party employed by them to show the property as one who was thoroughly acquainted with it and as their representative on the ground, and such party, in the course of an examination of it by experts, made statements with regard to it which he knew to be untrue, and also concealed and deceived them with regard to certain important tests and indications which would be damaging, the territory being wild and mountainous, and requiring some one to guide such experts over it, and the coal indications being obscure to a casual observer, the vendors were responsible for such misconduct, and, a purchase having been induced thereby, the purchasers were entitled to be relieved.

[Ed. Note.—For cases in point, see vol. 40, Cent. Dig. Principal and Agent, §§ 583, 719.]

8. VENDOR AND PURCHASER—RESCISSION—STATUS QUO.

    While rescission will not be ordered, where the status quo has been so changed that it cannot be restored, a substantial restoration is all that is required; and it is satisfied, as a rule, where the party against whom the rescission is asked gets back what he parted with, and the other party gives up what he got, unchanged.

    [Ed. Note.—For cases in point, see vol. 48, Cent. Dig. Vendor and Purchaser, §§ 205, 208, 209.]

9. SAME—LAND OPTIONS.

    Plaintiffs by fraudulent misrepresentations were induced to purchase a body of coal lands on which at the time the defendants had some 60 different options or rights to purchase at a certain price per acre, on which price a considerable advance was to be paid by the plaintiffs. In order to get title and complete the sale, with the acquiescence of all parties, the original owners were paid the portion coming to them, upon executing the proper conveyance to the plaintiffs, and the defendants were paid the rest. *Held*, that it was no objection to ordering a rescission on the ground, as contended, that the status quo could not be restored, that the defendants would be compelled to take back the lands in place of the options which they had originally held, which imposed no personal obligation, and also pay over, not only the money which they themselves got, but also that which had gone to the original owners.

    [Ed. Note.—For cases in point, see vol. 48, Cent. Dig. Vendor and Purchaser, §§ 205, 208, 209.]

10. MINES AND MINERALS—RESCISSION OF SALE—COMPENSATION TO BE ORDERED ON RECONVEYANCE.

    In a suit to rescind a purchase of coal land for fraud, which is sustained, the plaintiffs upon a reconveyance are entitled to have restored them the purchase money paid, with interest, the expenses incurred in having the titles searched and deeds made and recorded, and the taxes; but they are not entitled to expenditures for having the property examined and tested by experts, nor for the making of surveys, looking to the construction of a coke plant and the building of a branch railroad, nor for the organization of a corporation under which to operate, nor the issuing of bonds to finance the transaction; neither of these being of direct benefit to the property.

    Hermon A. Kelley and Horace Andrews (of Hoyt, Dustin & Kelley), for plaintiffs.

    A. Leo Weil and D. M. Hertzog, for defendants.

    ARCHBALD, District Judge.[1]  This is a bill to set aside a purchase of coal lands, on the ground of misrepresentation and fraud. In the spring of 1902 the plaintiffs, who were extensively engaged in the manufacture of iron at Cleveland and Youngstown, Ohio, were on the lookout for a body of coal lands on which they could erect a plant for the making of coke on a large scale. This was mentioned by Murray, one of their number, to R. M. Haseltine, an experienced coal man, at one time state inspector of mines in Ohio, who was commissioned to look over the different bituminous fields; and not long after, being at Uniontown, Pa., he brought up the subject in turn to Barnes and to Keighley, with whom he was acquainted, and was told by them that they had about what he wanted in the neighborhood of Masontown, Va. At that time the defendants held a large number of options, which they had taken up on lands in that vicinity, amounting, in conjunction with a

    [1] Specially assigned.

tract of 1,800 acres, known as the "Falls Tract"—which they had in prospect, and which they secured in the course of the summer—to some 5,800 acres; all, as it was asserted, being underlaid with the Upper Freeport vein, a recognized coal of the highest coking qualities. Having gone to Masontown shortly afterwards with Barnes and Keighley, and examined two or three openings about there, and being satisfied from this and the representations which were made with regard to the character of the property, Haseltine, on June 23, 1902, took an option in writing, in his own name, at $25 an acre; $10 to be paid down, and the balance in three equal annual payments, an advance of $13 on the amount which the defendants were themselves to pay. This action was communicated to the plaintiffs, but, owing to the absence of certain of their number in Europe, was not able to be considered by them until September; the option being twice renewed to meet that emergency. It was not, therefore, until September 9th, two weeks before the last extension would expire, that Murray, on behalf of the plaintiffs, was able to go and look at the property. He was favorably impressed with it, and so expressed himself to Barnes and Keighley, and on September 29th he visited it again, in company with Campbell and Wheeler, two other of the plaintiffs; the three being shown certain parts of the property by the defendant Barnes. The extent of the field, the coking qualities of the coal, and the required railroad facilities, were discussed on this visit, it being asserted by Barnes with respect to the former that the Upper Freeport vein underlaid the whole property, making a continuous body of coal of about 6,000 acres, and that there was also an under vein, the Kittanning, which would be thrown in. Meantime a more extended and critical examination had been insisted upon by Murray, and steps were accordingly taken to have it made. A map was necessary, and McMillan, the county surveyor, who was engaged in surveying the property for the defendants, was directed by them to prepare it; and, not being able to complete his survey until the latter part of September, the option was extended another 15 days. George W. Shaffer, a resident of the neighborhood, who represented the defendants locally, and had assisted in getting together the options which they held, was introduced as one who was thoroughly acquainted with the property, and would show it to the parties who were to be sent to look at it, and it was under his guidance that the examination by experts which followed was made. Their reports were favorable, and on the strength of them the plaintiffs closed the bargain and took the property, paying some $139,000 for it. Upon putting on a corps of engineers, however, to trace the outcrop and plan for its development, it was discovered that the Upper Freeport vein, on the strength of which it had been taken, underlaid but about one-third of the field, and, in addition, by reason of being cut into by deep ravines and gulleys, it was left in such a detached, irregular, and strung-out condition as to make the profitable mining of it a question. Feeling that they had been imposed upon, the plaintiffs, after some further investigation, took steps to rescind the purchase, tendering a reconveyance with reasonable promptness, and demanding back their money, and finally filing the present bill. This is the case in

outline. The further particulars will be given in the course of the discussion to follow.

The general principles upon which a suit of this kind proceeds are too well settled to need the citation of authorities. A misrepresentation with regard to material facts, by which a purchase of property is intentionally induced, amounts to a fraud which vitiates the transaction, and entitles the purchaser to be relieved. As a qualification of this, however, it is at the same time universally held that, where the means of knowledge are at hand, and are equally open to both parties, if the purchaser does not avail himself of them, he will not be heard to say that he has been deceived by the misrepresentations of the vendor, being charged with the knowledge of all that could have been so readily ascertained. And the same rule obtains where, not resting on the statements of the vendor, he undertakes to make, and does make, an independent investigation and verification of his own. Slaughter v. Gerson, 13 Wall. 379, 20 L. Ed. 627; Farnsworth v. Duffner, 142 U. S. 43, 12 Sup. Ct. 164, 35 L. Ed. 931; Smith v. Curran (C. C.) 138 Fed. 150. It is obvious, however, that in order to have this effect the examination must be an untrammeled one, and that this is not the case where fraud or concealment is practiced in the course of it, or misrepresentations made which would themselves afford occasion for relief. An examination perverted in this way by the act of the vendor is the same as no examination at all. Neither does it matter, if misrepresentation be proved, that the bargain, even so, was a good one, from which the purchaser is likely to sustain no loss. In an action of deceit, no doubt, this would be relevant on the question of damages, in order to show that there were none (Sigafus v. Porter, 179 U. S. 116, 21 Sup. Ct. 34, 45 L. Ed. 113; Pittsburg Life & Trust Co. v. Northern Central Ins. Co. [C. C.] 140 Fed. 888), although to this the authorities are not all agreed (Walker v. Walbridge, 136 Fed. 19, 68 C. C. A. 569); but not so upon a bill to rescind (Hansen v. Allen, 117 Wis. 61, 93 N. W. 805; Clapp v. Greenlee, 100 Iowa, 586, 69 N. W. 1049). The purchaser is entitled to the bargain which he supposed and was led to believe that he was getting, and is not to be put off with any other, however good. It is of no consequence, in the present instance, therefore, that the plaintiffs got coal lands of intrinsic value, which are worth, perchance, all that was paid for them, if they were fraudulently induced to believe, by representations for which the defendants are responsible, that the Upper Freeport vein, for which they negotiated, underlaid the whole property, whereas in fact it extends over but a comparatively limited part.

Turning, then, more immediately to the case in hand, it is not necessary to hold, as charged in the bill, that the plaintiffs are the victims of a scheme deliberately concocted by the defendants to get off onto them property which was known not to be of the character which they were led to suppose. It would, indeed, be difficult to so find. The evidence is not that way; however, there may be circumstances calculated to arouse suspicion, looking back upon the transaction and having regard to the sequel. It may be, for instance, that "Jos." Barnes (one of the original parties who took up the options, but who sold out

to Greer during the negotiations), as well as Greer himself, if not other of the defendants, had reason to believe that the Upper Freeport vein, by which the property was being sold, was of limited range over the Falls Tract, which constituted one-third of the whole acreage, and yet allowed it to be represented that it extended unbroken throughout the entire field, constituting, as it was declared, a body of coal of 5,000 acres, reaching over to the Cheat river. "Jim" Barnes' remarks, also, to McMillan: "Oh, let's call it all Freeport. We want the coal to go"—may seem to disclose a certain willingness to amplify, if not misstate, the facts; and it would no doubt inspire greater confidence in their honesty of purpose if the defendants, one and all, instead of clinging to the bargain after knowing the means by which it had been obtained, had followed the lead set them, and conceded the right of the plaintiffs to rescind. But giving due allowance to this and other circumstances which have been brought forward, and having regard not only to their individual but their collective weight, they are too inconclusive to justify the charge of intended fraud on the part of the defendants themselves. The declarations of the defendants with respect to the extent of the Upper Freeport vein may have been expressed with greater positiveness than was warranted, particularly in view of the distinct intimation to the contrary which they had. But they were at the same time accompanied with the qualification that they themselves had never been over the property, and were not much acquainted with it; and the statements could not therefore have been understood as anything more than the usual commendatory expressions which are accustomed to pass at such a time—"trade talk"—by which, however positive, no one is expected to be bound. Sawyer v. Prickett, 19 Wall. 146, 22 L. Ed. 105; Kimball v. Bangs, 144 Mass. 321, 11 N. E. 113; Pittsburg Life & Trust Co. v. Northern Central Ins. Co. (C. C.) 140 Fed. 888. And that the plaintiffs did not rely on these representations alone is shown by the expert examination which they undertook to make notwithstanding them. To the suggestion that "Jos." Barnes conveniently sold out his interest because he knew too much, there is to be opposed the confidence of Greer, who knew pretty much the same facts, and yet was willing to put just so much more money into the property. And the casual remark of "Jim" Barnes, to which allusion has been made, is more than offset by his straightforward expression of readiness to take back the property when its real character was disclosed, because it was not what had been represented or sold. That this course was not pursued, either by himself or the other defendants, is explained, according to counsel, not only by the advice that they were not liable, and the changed conditions which made it inequitable, but also by the fact that the money which they got out of the transaction has been tied up in the purchase of other land in that vicinity. It is to be remembered, moreover, that it was the plaintiffs who sought out the defendants in this matter, and not the defendants the plaintiffs; which naturally modifies our judgment, looking over the whole transaction.

But this is by no means all of the case, nor, indeed, the important part of it. The serious thing is the rascally conduct of George W.

Shaffer, the defendants' agent, in showing the property. As expressively acknowledged by Barnes to Murray: "That G— d— Shaffer is to blame for all of it." That he purposely set about to mislead and deceive those who were sent by the plaintiffs to examine the land is overwhelmingly established. For this we have not only the accomplished fact, but his own words as well, not being able to refrain from boasting of it after having been smart enough to do so. The motive is to be found in his interest. Not only was he employed by the defendants to show the property, for which he got so much a day, but he was further paid a certain price per acre (50 cents or a dollar, it seems to be differently stated) for each acre sold, which naturally made him desirous that it should go. He evidently resolved that it should not fail for lack of anything on his part, and it did not. His declarations after the fact are objected to as inadmissible to bind the defendants, being merely narrative. But not all of them stand that way. For instance, his taking McMillan to task for putting on his map the McKinney openings on the Falls Tract, which gave away the extent of the Upper Freeport vein in that section; and his declaration to E. M. Hartley, in the same connection, that he was not going to show these openings to Haseltine, and that "McMillan was too damned honest"; both of which were before Haseltine was taken over the property. Also his directions to Sanford Scott, the day that Haseltine was at Masontown, "to put his hands over his mouth so that he would not give anything away," and to caution his men not to say anything to Haseltine as to where the coal lay, and particularly not to indicate that there was any opening on the Falls Tract except the one at the depot; significantly observing that, if a mountain boy like himself could fool an Ohio expert, "let him take his medicine," and that unless they did this, and if it was found that the coal went so far up the hill (referring to the McKinney openings), they could not get the field to go, and it would stop the whole sale. But whether after the fact or not, all his declarations and statements as to what he did and why he did it are direct evidence both of knowledge and of purpose, and in any view are therefore competent. They are themselves facts, which, taken in connection with the occurrences as detailed by the parties whom he was conducting over the property, not only serve to give character to his acts, but disclose and confirm the deception practised upon them.

The first expert put forward by the plaintiffs to make a critical examination of the field was R. M. Haseltine, a coal man, as already stated, of considerable experience, through whose acquaintance with the defendants, particularly Keighley, the parties had been brought together. His examination began September 25th, before the last visit of Murray and the others, which he missed, but was continued, by direction, after it. He had arranged to have McMillan show him the property, with whom he had worked in putting together the map of it; but upon going to Morgantown, Shaffer turned up instead, meeting him with a conveyance at the station, and taking him in charge. The first point visited was the so-called "open cut" on the Falls Tract, the position of which, and other places referred to in the narrative to follow, will appear by the accompanying diagram:

MASONTOWN COAL FIELD
PRESTON CO WVA

It was declared by Shaffer that the vein here was the same as had been seen by Haseltine on previous visits at the Old Mill and the Scott mine, which was known to be the Upper Freeport, and that it extended clear through to Rohr, as he would show him, and also over to Bee Run to the east—a distance of about six miles. It was a new exposure, as he said, which he had had made to demonstrate that the coal was under the whole field. This was untrue, and he knew it, or, at least, was in such doubt that he had no right to make so positive an assurance with regard to it. It may be that in the beginning he believed what he stated, for we find him contending with U. G. Watson, one of the original owners up there, before the Falls Tract was bought, that the Kephart property adjoining carried the Upper Freeport, having leveled over, as he said, from where it cropped in the road. Neither is too great stress to be laid on the fact that when this tract was being bought of the owners he argued that there were but 500 acres of the Freeport vein, where they contended for 600 or 700. Sale was being made by the acre, and he would naturally talk the quantity down, and accept, what they conceded, that at most but one-third of the tract was coal. But putting all this aside, and whatever may have been his earlier views, enough remains to show that he had no doubt as to the character of this vein at the time in question. For instance, when asked by McMillan, after the defendants had taken up the tract, whether he had not found a splendid opening of coal at this cut, he said that he had made the Falls people, the original owners, very sick over it, making them believe that it was a fine vein, although in reality there was nothing but a small stratum of coal and then a stratum of slate, the coal and slate being so mixed up that it was of no value. To the same party also he said that there was no Freeport coal as far as Rohr, although he had told Haseltine just the contrary; that it did not exist in that region, giving as a reason that wells had been bored there, and did not go through it. To W. H. Warner, a prospective purchaser, when he and Keighley and Shaffer were at the cut together in the early summer, Shaffer professed not to know what the vein was; it being generally agreed, however, by them all that it was not the Upper Freeport. So to U. G. Watson, after describing how he had sheared down the sides of the vein with a pick, so as to make it look like Freeport coal, and telling him how he had fooled Haseltine with regard to it, he admitted that it was Kittanning. And after the deal with the plaintiffs was closed, and he was urging Sanford Scott, one of the original owners, to take cash and discount the notes which he held for the deferred payments due him, his chief argument was that the purchasers would find out that there was no coal in that section, and then not pay the rest; which led Scott to say: "George, you know there is no coal in that country," to which he replied: "Damn it, I know that, and that is why we are trying to get the money before they find out." There is evidence, also, that instead of this opening having been made in the ordinary manner, the sides had been carefully trimmed down, by reason of which the vein was given a much better appearance, and one which was calculated to obscure the different benches of coal and slate, and make them look pretty much alike. This is

directly testified to, not only by the parties who did the work, but by others who saw it afterwards, and it is not necessary therefore to rely for it upon Shaffer's after vaporings; and, as there was no reason for this peculiar preparation, except for purposes of deception, this is the only one that is able to be ascribed to it. There is no proof, it is true, outside of Shaffer's own statements, that in starting out with Haseltine he put a pick into the wagon, which subsequently disappeared, so as to make evidence of his declarations as to how he afterwards took it out and conveniently left it behind. But there is enough without this to convince of the duplicity which he professed to have practiced. It is also true that, notwithstanding all, Haseltine was able to get a pretty accurate section of the vein, as is shown by the comparison of his report with that of Mr. Baton, who examined it under favorable conditions after the plaintiffs had taken possession of the property. So that, if the matter stood on this alone, there would be little, if anything, to lay hold of. But it is not, after all, the deceptive appearance given to this opening, nor the obstacles thrown in the way of a correct examination of it, although on the question of intent they are not to be lost sight of. It is the positive assertion by Shaffer that the vein so shown was the Upper Freeport that is justly complained of, and that it extended easterly to Rohr and Bee Run in a continuous field, which was not the fact, to his certain knowledge. Coupled with his reiterated declarations that he knew every foot of the territory, and had traced the outcrop around it, it could not have been understood or intended to be taken as a mere expression of opinion, which was to go simply for what it was worth, except as it was verified, but as a matter upon which he was fully advised, and which, therefore, could be relied on; in the face of which it will not do to say that no one had any right to do so.

Nor does the case stop here. In fact it is merely the beginning. The next day Haseltine was taken to the Lucy Burke mine, over toward the Cheat river, the vein there being declared by Shaffer to be the same as at the Old Mill mine at Masontown, which he confirmed by pointing out what he said was the Upper Freeport or Mahoning sandstone over it; a very persistent rock, as he explained, by which it was usually identified. From there they went on down into the Cheat valley until they came to Bee Run, and then up that stream to the Gibson mine, where the vein, according to Shaffer, was the same—a statement which its fiber and the surroundings seemed to verify. The course taken to reach this place was misleading, and in all probability purposely so, but the statements made with regard to it as well as the Lucy Burke, might pass as nothing more than expressions of opinion, to be correspondingly allowed for. Neither is it necessary to stop over the evidence, which is abundant, that Shaffer knew, or was at least convinced, contrary to his assurances to Haseltine, that the vein at the Lucy Burke was not the Freeport; nor to refer to his boasting afterwards to his neighbors as to how he had fooled him with regard to it. All these merely come in, in the general summary of his conduct. As to the Gibson mine, however, there is something more serious. These openings were located on his father-in-law's farm, where he had lived

for a couple of years; and 200 feet higher up in level, and not more than 100 rods distant, on the Mary J. Shaffer (his brother's wife's) farm, was another opening, known to be into the Upper Freeport, with which he was familiar. The vein at the two places could not be the same, by reason of differences of elevation; and if this were so, and if it was the Kittanning and not the Freeport which outcropped at the Gibson, which was thus demonstrated, it was essential to a correct knowledge of the field to be shown the proofs of it. Nothing was said, however, with regard to the Mary Shaffer mine, although Haseltine and Shaffer went by there the next day in coming down to the Everly. Shaffer's excuse is that the mine had fallen in, of which there is some evidence. But even so, and although this may have prevented seeing the vein, it was still most important as showing the outcrop, and should not have been passed by. That it was designedly done there can be little question, and there was thus at this point in the examination not only willful misrepresentation but practiced concealment, sufficient, of itself, to justify a rescission if the defendants are responsible for it.

Passing by the excursion through the Bull Run valley, which followed—where a large cascade of conglomerate in the bottom of the creek was represented to be Upper Freeport sandstone, and that vein was declared to underlie the entire valley, which was said to constitute a synclinal or trough—and also the visit to the Roby, several miles farther up, which was stated to be the other side of the synclinal, with all of which Haseltine, as a coal expert, ought not perhaps to have been deceived, the next day, after an intermediate visit to the Mary Cress and the Everly, they went to the Old Mill mine, near Masontown, which they examined, together with an opening some 500 feet across the creek, on a corner of the Falls Tract, on all of which the Upper Freeport was unquestionably found. According to McMillan's map, a further opening was also shown in this section of the field, and Haseltine accordingly inquired about it; but was met by the statement that there was none, and that its entry on the map was a mistake. The country about there was declared by Shaffer to be an unbroken forest, with no way to get through it, owned by people in the East, who paid no attention to it. As a matter of fact, the map was correct, and there was a well-known mine (the McKinney) in the direction indicated, which had long been opened, and to which a county road directly led, from a point across the railroad near the station, up over the hills, somewhat obscured from observation, however, where it started. Of all of this Shaffer, of course, knew; but the openings told too plainly against the property to have Haseltine visit them. As will be seen by the diagram, they were in the Freeport vein, on the southerly exposure or outcrop, establishing beyond a peradventure the very narrow and limited range of the field in that vicinity. Knowledge of this was thus of the utmost importance, and its concealment a most flagrant breach of faith, which nothing will excuse. This practically closed the examination of the property by Haseltine; his subsequent visit, October 7th, after Murray and his party had been there, being without particular significance, merely for the purpose of obtaining samples for coking, which he got from the Old Mill mine.

The next person to go upon the field on behalf of the plaintiffs was Theo. O. Deaumer, sent out by Mr. Selwyn M. Taylor, whose opinion had also been asked, to make a preliminary examination preparatory to that of his own. In the main Deaumer's experience with Shaffer was similar to Haseltine's, but was somewhat peculiar at the outstart. As will be recalled, the option expired October 8th, and had been renewed for another 15 days; a further renewal beyond that being refused. The time was therefore short, and on the day named Deaumer went to Morgantown with written instructions from Mr. Taylor to trace approximately the outcrop of the Freeport, which was recognized as the controlling vein, and to get samples. Driving to Rohr, he inquired for Shaffer, and found he was at Masontown. Calling him up by telephone, Shaffer came to Rohr at his request, but upon Deaumer telling his errand, and presenting his letter of instructions, Shaffer positively refused to show him the property, telling him that he might as well go right back to Pittsburg. Apparently reconsidering the matter later on, he said that he would go and see his people (the defendants), and find out what was the matter, whether anything had gone wrong; and he went off in the direction of Morgantown to do so. The next day, having heard nothing from him, Deaumer concluded to start out and find what he could unaided. Shaffer had told him that the coal was down at the bottom of a ravine, which he pointed out, and so had one or two others, but going down into it Deaumer found nothing, and after wandering around for a couple of hours and getting lost he gave up the task, managing in some way, he hardly knew how, to get back at last to Rohr. Getting a message from Shaffer, he then went to Morgantown; but on reaching there he found that Shaffer had gone on to Uniontown, Pa.—as he left word—to see his people. Puzzled by these maneuvers, Deaumer telegraphed Taylor, and got instructions to go ahead and do the best he could. In the meantime, however, Shaffer reappeared, and stated that his people knew nothing about this, and that he had no orders to go with him; but the next day he came, and said he had decided to do so. Three days had been wasted in this way, and the rest of that one was consumed in getting back to Rohr. Starting out from there the next day (Sunday) they had not gone far before the team balked, throwing them out, and breaking the harness, and they were compelled to return to Morgantown for another outfit. Considering that it was the evident desire of Shaffer to use up time, and that this team had been procured at his urgency at a livery kept by a friend, whom he particularly recommended, after Deaumer had already secured a conveyance at another, it requires no stretch of the imagination to conclude that Shaffer had a good deal to do with its being balky. Be that as it may, another day was gone, making five in all; and leaving but ten in which to make an examination and report and take up the option.

Getting back, however, to Rohr, they made a final start from there the next morning, and driving along toward Masontown they came to the outcrop or coal blossom in the road, which is shown on the diagram. Deaumer wanted to stop and examine it, asking whether

it was not Freeport coal. "Oh, no," said Shaffer, "that is one of the upper veins in this territory. Come on about half a mile or so. I can show you the Freeport at a much lower depth, and you can get a sample." That this coal blossom was the Upper Freeport, and that Shaffer knew it, there can be no question. Arguing with Dr. Cobun on the subject, on one occasion, before any negotiations with the plaintiffs, Shaffer contended at first that it was the four foot or Masontown vein. But upon Dr. Cobun declaring that it was not, and that it was the Freeport, Shaffer acknowledged that he knew it, but that it was all right to make others believe so. Discussing with U. C. Watson, before the option on his property had been taken, whether certain farms to the north carried the Freeport vein, Shaffer declared that he had leveled across from where it came out at this point; thus conceding the identity of the outcrop there. On the other hand, in several different talks with Squire Scott with regard to taking up these same farms, Shaffer maintained that it was not material whether they were secured or not, as the Freeport ran out there. Not far away, also, Shaffer had helped to survey and lay out on the Scott farm a two-acre reservation around a coal opening, which was recognized to be in the Freeport vein. There is other evidence, more or less conclusive, to a similar effect, which might be referred to. But without going into it, there is enough, as it stands, to show a willful misrepresentation by Shaffer of the facts with regard to this coal blossom, the importance of which to a correct estimate of the field was conspicuously apparent and fully known to him. Located high up in the hills, as it was, if this coal blossom was the Upper Freeport, it showed that the vein, rising rapidly from the Old Mill mine on the south, ran out at this point, discrediting the entire territory beyond it. This the expert whom he was conducting over the property was entitled to know, and Shaffer was bound to disclose it, or, at least, not to misstate, as he did, the facts which he knew with regard to it.

Having got Deaumer by the coal blossom, and saying nothing to him about the opening in the Freeport on the Squire Scott farm, just spoken of, Shaffer took him, as he had promised, to what was in reality an Upper Freeport opening farther on, known as the Sanford Scott Mine (not the Squire's) also sometimes called the Jacob Grove. This is a southerly exposure, and is down in a ravine, over the hill, so as to convey the idea of a low level, and is quite deceptive on that account, except as it be corrected by other data. It was correctly stated, however, to be Freeport coal, and the other matters, of course, were for the expert. From there the two went back to Rohr, and then out another road to the Mary Cress mine, which is also a southerly outcrop of the Freeport, and was so stated. It is similarly approached, however, in a way to suggest a low level, and is not calculated, therefore, to give an altogether correct impression; but for that, by itself, no one is to be held responsible. The Lucy Burke was next, and was also reached from Rohr, and pretty much the same occurred there as at the visit of Haseltine. Deaumer was pleased with the coal exposure, and asked if it was the Upper Freeport, to

which Shaffer said, "Yes, this is the same coal we saw over at the Mary Cress bank." It was at the foot of a pretty good-sized hill, and some boulders on top, which attracted Deaumer's attention, were said to be the Mahoning sandstone.

Following the same course pursued with Haseltine, Deaumer was next taken down into the Cheat valley, and then up it to Bee Run, and then up Bee Run to the E. C. Gibson property. Noticing 10 or 12 inches of slate in the vein at that point, Deaumer asked what was the matter, and whether Shaffer was sure it was Upper Freeport, to which Shaffer replied, "Yes"; that he knew it was the same as the Mary Cress. As to the slate, he said it thinned down farther in, and was merely local, and, going into the mine to satisfy himself, Deaumer found that this was so. Here, again, the same as with Haseltine, Shaffer omitted to point out any of the other openings in that vicinity, the importance of which to a fair knowledge of the field has already been alluded to. He did, however, show the Taylor mine farther down, going from there up the Bull Run valley to the Roby mine, which was correctly given as Upper Freeport coal, and thence to Masontown, where they examined the Old Mill mine and the Scott mine opposite it. "Now," said Shaffer to his companion, "you have been around the outskirts of this field pretty well, and we have been to one or two places in the middle, and you can see that the whole of it is underlaid with Upper Freeport coal." This he also undertook to demonstrate by the map by referring to the different places where they had been. After supper Deaumer got looking at the map again, and was led to ask whether there were not some openings on that part of the Falls Tract near where they were which he could see. "No," said Shaffer, "there is no use of going over there. The coal dips right under the creek. You can't see it. There's no exposure, and furthermore it's too rough. You can't travel back in there." Returning to Rohr, and again consulting his map, Deaumer noticed the indication of an opening (the McKinney) on this tract, the same as Haseltine had, and again brought the matter up, asking how it happened to be there. But Shaffer declared that the map was not right, and that the opening ought not to be on it; that McMillan put it on, but that it did not belong there. All of which, of course, was untrue.

The final point visited was the so-called "open cut," on the northwest margin of the field, which Shaffer was possibly moved to show by reason of Deaumer's inquiry for developments on the Falls Tract. To this, therefore, the next morning, they started out, but found it in such a condition that, according to Deaumer, he could only get a glimpse of it. There is nothing to account for the transformation which had taken place in this opening in the three short weeks since Haseltine saw it, and there is at least ground for suspicion that it had not fallen in unaided. But that, after all, is not so material. The telling thing is, that here, as well as elsewhere, at essential points all over the territory examined, in the face of what he knew to the contrary, Shaffer declared that the vein was the Upper Freeport, the same as at the Mary Cress, establishing, as he said, the extent of

the field. While still at this cut, with Shaffer's assistance, Deaumer proceeded to sketch in on his map the line of the Upper Freeport outcrop, as indicated by his supposed observation of it at different points; this line, as so laid out, being thus not only inherently in error in its general contour, by reason of Shaffer's misrepresentations, but also, at several places along the creeks and valleys in the middle, being made, by Shaffer's misleading promptings, to vary widely from where it was ultimately found.

With this misinformation instilled in to the assistant whom he had sent out, Mr. Selwyn M. Taylor, on October 14th, came himself upon the field. Shaffer said that another party wanted to see it, and left Mr. Taylor to the guidance of Deaumer, by whom he was shown the coal blossom in the road, the Sanford Scott or Jacob Grove pit, the Old Mill mine, and the Masontown bore hole to the south of that. For lack of time they did not visit the openings to the northeast, towards the Cheat river, but Deaumer told Mr. Taylor that according to Shaffer they were Upper Freeport, which Shaffer had further assured him underlaid the whole. He also showed the notes which he had taken, and the line of the outcrop as he had sketched it in with Shaffer's aid. Being asked by Taylor why he skipped certain openings with it which were marked upon the map, he explained that Shaffer said they were not the Freeport but the Upper Four foot or Masontown vein. He also repeated the declaration of Shaffer that the McKinney openings, shown on McMillan's map, were a mistake. The misconception of the property induced by Shaffer was thus carried forward, and colored the views of Taylor, and the deception of the three experts who had examined the property was complete. Based on the data which he supposed he had obtained, on October 20th, Mr. Taylor made a favorable report, which, with a similar report from Haseltine, was gone over carefully by the plaintiffs, and, after a further extended conversation on the subject with Taylor by telephone, it was decided on October 23d, two days before the option expired, that they would accept. The defendants having been notified, a new and somewhat modified contract was subsequently drawn up, by which, among other things, the price per acre was reduced to $23.50, following which steps were taken to have the titles examined and the proper papers passed. By the middle of January, 1903, deeds were executed and delivered and payments made as to all but three of the different tracts, and by April 4th everything as to these also had been closed up. Meanwhile a corps of engineers were put upon the property, to run the outcrop line, and another to locate a site for the proposed coke plant, and lay out the branch from the Baltimore & Ohio Railroad. It was at this juncture, and as a result of the survey, that the plaintiffs for the first time discovered the deficiencies in the property and the mistake which had been made in the estimate of it; and being convinced, as already stated, after having fully investigated the subject, that they had been badly imposed upon, and the defendants, after having their attention called to the matter, having refused to recognize their responsibility, the present bill was brought.

By the facts which have been so recited, and others to be found in this record, it is established to a demonstration that the most glaring misstatements were made with regard to the character of the property, on which the plaintiffs were led to rely, as the result of a confidence directly inspired, the responsibility for which the defendants cannot avoid. It is of no consequence that they are not themselves convicted of misrepresentations, and that they suffer for the delinquencies of another. This is unfortunate, but it is not material. The acts of Shaffer, their accredited agent, within the apparent scope of his authority, were their acts, and his misconduct theirs, and they must take the bargain so secured with all its infirmities—the burden equally with the benefit.

It is idle to argue against his agency, the defendants having expressly recognized and held him out as their local representative to show prospective purchasers over the property, on whose knowledge they could rely. The country was wild and mountainous, which made it important that some one intimately acquainted with its peculiarities should act as a guide; for which we need no more than the experience of Deaumer in trying to make an independent examination of his own. But more than this, the coal indications to a casual observer were obscure and elusive, and needed an interpreter, and this the defendants undertook to supply. Declaring themselves unfamiliar with the property, in repeated conversations with Murray and Haseltine, they referred them to Shaffer, as one who had taken up the coal field for them, and was thoroughly acquainted with it, and would show it to any one who was sent to examine it. He was actually under contract with them to do so, and was to get $2 a day for his services, in addition to the price per acre he was to receive in case of a sale; on which basis the defendants settled with and paid him for what he did in taking Haseltine and Deaumer over the property, thus virtually adopting and confirming his acts. The contention is that he was merely to take the plaintiffs' experts to such points as they desired to see, and that, as to anything outside of this, he was a volunteer. But he did not so understand his duties, nor did they; nor was that the extent of his contract or commission. He was to do this, but he was to do more. He was to show the field as an aid in selling it, and was expressly commended to the confidence of the plaintiffs to that end. So accredited, he was bound to show it as he knew it, without evasion, concealment, or misrepresentation. No doubt the defendants might have contented themselves with much less. They were not required to make any disclosures with regard to the property, allowing the plaintiffs to get such information as they could. But this would not have sold the land, and they did not stop with it. Nor could it have been understood that, in introducing and commending Shaffer as one who was intimately acquainted with the property, and would show parties over it, it was intended to limit him to acting as a mere uninformed and uninforming guide. He was not called, of course, to furnish expert knowledge, and, as already observed, his expressions of opinion are carefully to be distinguished from his statements of fact. It was for those who were

sent to examine the property to draw their own conclusions from the information which they received and the observations which they made, and it was on this that the plaintiffs were expected to rely. But this required the information furnished to be as complete and accurate as possible, and in undertaking to give it, through Shaffer, as they did, the defendants were bound to see that it was as he and they knew it, and not misrepresented or distorted, or concealment and deception practised, as was the case.

It is said that the experts who were employed by the plaintiffs failed in their duty, and relied on what was told them to an extent that they had no right to do; that they were bound to take the statements made them only so far as they were proved; and that this is nothing more nor less than an attempt to put off on the defendants the result of their inefficiency and mistakes. Also, that the defendants did their full duty when they placed in the hands of Haseltine and Deaumer carefully prepared maps of the territory, showing the different openings, to which they were severally taken, and allowing them to make such observations and deductions as they chose; and that the plaintiffs relied on the examination so made, and the reports which they got through these sources, with the character of which the defendants had nothing to do, and for which they are not now to be held. But this is more specious than sound, and has already practically been answered. It seeks to measure the defendants' responsibility by the delinquency of others, if any, rather than by their own, and it puts out of sight the direct agency which they had in the final result. It may be that Haseltine and Deaumer allowed themselves to be drawn into a confidence which they should not have entertained, as the sequel no doubt proves. But it cannot be said that the professions of Shaffer as to his intimate knowledge of the country, as well as the credit directly given him by the defendants, did not invite, as well as justify, it at the time. And it ever comes with an ill grace for any one to suggest that too implicit a reliance has been put in what he has said and done. Pom. Eq. Jur. § 896, n. Nor was it to be expected that those who were inspecting the property under Shaffer's guidance would not only steel themselves against his statements, but be able to detect the deception in which he indulged. They were at least entitled to rely on being treated with common honesty, and not to assume that they were dealing with a rascal. And to expert reports, based upon misinformation and concealment, as these were, a purchaser cannot in all conscience be held. Undoubtedly, the plaintiffs were led to close with the option and take the property on the favorable reports of it which they got. But this only serves to emphasize the responsibility of the defendants for the fraudulent means by which these reports were induced.

It is said, however, that the character of an undeveloped coal field, such as this, can never be determined with accuracy, and, the means of knowledge with regard to it being open to the same extent to both parties, the purchaser is bound to investigate it for himself, and is not entitled to rely upon the representations of the vendor, which are to be taken as mere expressions of opinion, by which,

as it is conceded, no one is expected to be bound. The general principle which is so appealed to has been already recognized in this opinion, but has no application to the case as made. It has also been practically disposed of in what is said above. An examination of the field by the plaintiffs may have been a duty, and, had it been made without any attempt on the part of any one to influence it, there would have been no just ground for complaint. But unfortunately that was not the case. There was a direct intervention in it by the defendants, through the agency of Shaffer, which upsets it all. It may be that his statements with regard to the character and identity of the vein might pass, under ordinary circumstances, as mere expressions of opinion, under the rule invoked. The trouble is, however, that they were made in the face of direct knowledge to the contrary, which he had no right to misstate, as he did. They were in fact, for the most part, nothing short of positive falsifications, accompanied also by concealment and deceptive showing, the responsibility for which the defendants must assume.

It is further said that the denial by Shaffer that there were any developments on the Falls Tract, such as the McKinney openings, is the only serious thing in the case, and is met and offset by the fact that they were plainly shown on McMillan's map; and that, the defendants having unmistakably in this way affirmed to their existence, neither Haseltine nor Deaumer was authorized, on the mere say-so of Shaffer, to assume that they were not there. It amounted at the most, as it is urged, to an assertion by the defendants by one representative that there were such openings, and a denial of it by another; and, the one being as much to be relied on as the other, concealment cannot therefore be charged. It is conceded that a different aspect would be put upon the matter, so far as Haseltine is concerned, if Shaffer called McMillan to task for it in his presence. But this is denied; the interview in which that occurred, as it is claimed, being when Haseltine was not there. The evidence is not clear upon the latter point, and the defendants' version may therefore be accepted. But, even so, it does not justify the argument made. Notwithstanding the map, it could not be expected that Haseltine would persist in the face of Shaffer's denial. What good, indeed, would it have done him if he had? And what inquiry of others, after Shaffer's careful instruction to the people about there, would have been likely to succeed? No road to these disputed openings was indicated on the map, and none was visible; in confirmation of which he was assured by Shaffer that the country in that direction was an impassable wilderness, owned by people who paid no attention to it. This was plausible, and was bound to prevail, coming, as it did, from one of whose intimate acquaintance with the region Haseltine was assured, not only by his own reiterated declarations, but by the assurances of the defendants themselves. Against the particularity and positiveness of statement indulged in by Shaffer, the map counted for little, and could not be expected to. At the best, it was indefinite and inconclusive, the unsupported declaration of an absent party, and to cling to it under the circumstances would have been a reflection by Haseltine on his companion, which might have deprived him of

his further guidance. He had a right, therefore, as had Deaumer after him, to rely on the statement of Shaffer that the map was a mistake, and to disregard it as he did. It is, of course, not to be accepted that this is the only serious feature in the case. There are others equally so, even if this were out of it; but the truth is that, notwithstanding what is said of it, it is to be reckoned with along with the rest, in the general account which the defendants have to face.

It is finally urged with confidence, as a ground for denying relief notwithstanding the misrepresentations proved, that the relation of the parties to the subject has been changed, and that, the plaintiffs being unable to restore the status quo, the right to rescind, if it ever existed, is now irreclaimably gone. The defendants, as it is pointed out, at the time they were approached by the plaintiffs, had some 60 different options, by which the collective field was held. This imposed upon them no personal obligation, merely giving them the privilege, according to their ability and pleasure, to take or refuse any one or all. These options, by their contract with Haseltine assigned to Murray, they agreed, as it is said, to hand over, without more, at a certain additional figure, an option on an option, which also involved them in no responsibility, and enabled them simply to make the difference in price. This optional contract, as it is further said, was subsequently superseded by the one of November 17th, with new and modified provisions, which put quite a different aspect upon the matter. The price, for one thing, was reduced from $25 to $23.50 an acre, and there was to be no less than 5,000 acres in all, while by the original agreement nothing was said about this; and according to the options which the defendants were to turn over, payment was to be made simply by the coal acre, the quantity of which was to be determined by a survey. Abstracts and searches were also now required, showing marketable titles free and clear of incumbrances, which had not been previously exacted. And whereas, by the prior agreement, payment was to be made to the defendants themselves ($10 an acre down, upon presentation of a good and sufficient title, and the balance with interest in three annual payments), leaving it to them to take care of the purchase money going to the original owners, by the subsequent agreement, payment to the latter was to be made direct, and only the amount over and above this was to be turned over to the defendants. As the result of all of this, it is pointed out that, if rescission is now ordered, the defendants will get back, not the options which they held and the freedom of action which they enjoyed under them, but will be saddled with the land itself, which they might never have concluded to take, together with the additional tract about the Everly mine, which the plaintiffs directed to be purchased, not included in the original bargain; and they will also be required to repay the whole purchase price—some $139,000—to say nothing of the other moneys claimed, over $70,000 of which has gone into the pockets of the landowners, and of which they never got a penny. Moreover, had they taken up the land themselves, on the options which they held, but which are now inoperative, the deferred payments, as it is claimed, would have been met by the earnings from the property, which they had proposed to develop, but

which is now a dead load on their hands, having yielded nothing also all these years, while interest has been mounting up against them.

It is no doubt true that rescission will not be ordered, where the status quo has been so changed that it cannot be restored. 29 Am. & Eng. Ency. Law (2d Ed.) 647; 6 Cyc. 306. But this is merely out of the desire to do full justice, and is not to be carried too far. A substantial restoration is all that in any event is required. 29 Am. & Eng. Ency. Law (2d Ed.) 649; 6 Cyc. 307, 310. It is satisfied, as a rule, where the party against whom rescission is asked gets back what he parted with, and the other party gives up what he got, unchanged. The mistake in the present instance arises from a misconception as to what this was. The misrepresentations upon which a rescission is asked entered into the whole transaction, and there is no distinction between the contracts such as is sought to be made. The false impression created in favor of the property continued to be operative to the end, and affected, not only the contracts themselves, but all the steps by which the sale was finally consummated. The purpose of the negotiations from the beginning was, on the one hand, to get the property, and on the other to dispose of it at the price agreed upon, and they cannot be divided up in the way suggested in order to let the defendants out. Their relation to the property, of course, has changed, but that is not material. It had to, in order to carry out the bargain which they made, as was, in deed, well understood. The plaintiffs did not buy the options, as argued, but the land, which the options merely held for the defendants, and enabled them to dispose of at the large profit which they made. The payments to the original landowners were necessary in order to get title, and were with the concurrence and for the convenience of all parties. They were the same, in effect, as if made to the defendants themselves, and, not being able to be required back from the landowners, with whom the plaintiffs have no contract connection, and who are not chargeable with anything, the burden of repayment must be assumed by the defendants, whatever personal hardship it may entail. They get back the property in the same condition that it was, even though their relation to it may not be so favorable, which is all that they can ask, being themselves alone responsible for the change. Otherwise, notwithstanding the fraud practiced upon them, if the argument should prevail, the plaintiffs would be compelled to keep the property which has been put off upon them, which was not what they bargained for or wanted, or was represented to be; while the defendants, by whom this situation was brought about, would be permitted to have the full benefit of the transaction, and retain the large amount of money which they made out of it. This is not equity, and is not the rule to be here enforced.

It remains to consider the exact measure of relief to be given by the decree. A reconveyance has been tendered, and the deed which has been executed in that connection will be made effective when the defendants are in shape to comply. And in return for it the plaintiffs will be entitled to be reimbursed the money which they paid out on the strength of the purchase and as contemplated by it. This has been gone into, in detail, in the proofs, for the purpose of saving the expense

and delay of a reference to a master, so as to come at once to a final decree. A statement by items of what is claimed on this account by the plaintiffs is set forth in the margin[1]; but only a part of it can be allowed. The expense, for instance, of sending experts into the field to examine it and test the coking qualities of the coal was preliminary to a purchase, and independent of it, and for it the defendants cannot be held. The plaintiffs would not have taken the property without an examination, and the expenses would thus have been incurred whether they did or not. It stands here the same, in fact, as though there had been no sale at all. If the misrepresentations which are relied upon had preceded the examination, so that it could be said to have been induced by them, it might be different, but as it is this item must go out. The same is true of the traveling expenses incurred in that connection, and the small item of expense for smelting. Neither can claim be made for outlays incident to the incorporation of the Coal & Coke Company which was organized. A corporation to develop the property and a bond issue to finance the enterprise may have been

[1] Services of experts in examining and reporting upon the coal field, and in examining and testing the coke from the Freeport vein of coal:

| | | |
|---|---:|---:|
| R. M. Haseltine........................ | $1,931 96 | |
| Selwyn M. Taylor............................ | 474 21 | $2,406 17 |
| Expense in smelting coke............................ | | 13 00 |
| Expense for traveling to examine the field of coal, including telegrams and telephone messages........... | | 487 86 |
| Expense for legal services in drafting contracts, examining and passing upon deeds, abstracts, and titles to all the property entering into the field of coal; organization of the Masontown Coal & Coke Company; preparation of mortgage and issue of bonds; other like services connected therewith, with expenses of traveling......................................... | | 4,486 97 |
| Expenses for taxes on property, recording of deeds, payments to assessors, etc......................... | $579 28 | |
| Credit: Tax assessor's fee returned................. | 2 50 | |
| Balance ........................................ | | 576 78 |
| Expenses incidental to the organization of the coal and coke company, including issue and printing of bonds, payment to public officers, with interest on bonds prior to discovery of fraud, certification of bonds, etc........................................ | $1,141 67 | |
| Credit: Interest received on bank deposit........... | 722 22 | |
| Balance .................................... | | 419 45 |
| Expense of superintendence of property, including initial steps toward construction of coking plants and railroad prior to discovery of fraud................. | $2,209 92 | |
| Credit: Office supplies sold........................ | 25 92 | |
| Balance ................................. | | 2,184 00 |
| Expense of engineering in connection with construction of coking plant and railroad................. | | 3,917 90 |
| Amount paid for coal lands......................... | | 138,923 01 |
| Total................................... | | $153,415 14 |

convenient commercially, but they were not essential to the use and enjoyment of the property, so as to make the defendants responsible. This includes also the claim for legal services, except so far as they were incurred in the examination of titles, making of deeds, etc. The expense of superintendence, including the steps looking to the construction of a coke plant and the building of a branch railroad, and the engineering work involved therein, present a closer question. These expenditures were made on the strength of the purchase, and the development of the property in this way was the subject of discussion between the parties, so as to be known to the defendants to have been in contemplation. It is at the same time true that, if they had gone on and resulted in actual improvements, no claim, according to the authorities, could be made for them, except to the extent that they directly benefited the property (16 Am. & Eng. Ency. Law [2d Ed.] 75; 29 Am. & Eng. Ency. Law [2d Ed.] 651; 6 Cyc. 642); a consideration which seems to effectually exclude them.

This leaves merely the purchase money paid, with interest, the legal services for examining titles and making deeds, and the recording fees, taxes, etc. 29 Am. & Eng. Ency. Law (2d Ed.) 651. The aggregate amount of this will be settled by the decree, and a reasonable time will be given for its repayment. As the deed reconveying the property will not be delivered until this is completed, there is no occasion at present for ordering a lien in favor of the plaintiffs, or providing for a sale of the property in case of default, with a decree against the defendants for the deficiency. The decree to be entered will impose a personal obligation, and it will be sufficient to meet the other matters when they arise. The defendants will also pay the costs.

Let a decree be drawn by counsel to the effect indicated