## NATIONAL LEATHER CO. v. ROBERTS.

(Circuit Court of Appeals, Sixth Circuit. March 2, 1915.)

No. 2523.

1. CORPORATIONS ⊜80—STOCK SUBSCRIPTIONS OBTAINED BY MISREPRESEN-
TATION—GROUNDS FOR RESCISSION.

Where a corporation, as an inducement to purchase its preferred stock, offered as a bonus to subscribers an equal amount of common stock, a false representation to complainant that preferred stock offered to him and which he bought had been contracted by a prior subscriber, who insisted on retaining his common stock, when in fact the stock offered was treasury stock, was not ground for rescission of his subscription, since the misrepresentation did not tend to induce his subscription, but the contrary.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 244, 246–264, 1407, 1407½; Dec. Dig. ⊜80.]

2. EQUITY ⊜42—JURISDICTION—WAIVER OF OBJECTIONS.

Where a suit in a federal court is within a recognized head of equity jurisdiction, the question whether it is rightfully brought on the equity side will not be raised by the court on its own motion, but must be presented by the defendant at the first opportunity.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 119, 120; Dec. Dig. ⊜42.]

3. CORPORATIONS ⊜80—STOCK SUBSCRIPTION INDUCED BY MISREPRESENTA-
TION—GROUNDS FOR RESCISSION.

While an untrue representation that all or a certain amount of the stock of a corporation has been subscribed may justify a rescission of a subscription contract so induced, it is not ground for rescission where it was immaterial, as where it was so nearly the truth that no loss resulted to the subscriber.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 244, 246–264, 1407, 1407½; Dec. Dig. ⊜80.]

4. CORPORATIONS ⊜80—STOCK SUBSCRIPTION INDUCED BY MISREPRESENTA-
TION—GROUNDS FOR RESCISSION.

A false representation, made to a subscriber for preferred stock of a corporation, that all of such stock had been subscribed for, held not ground for rescission of his subscription, where at the time less than 10 per cent. of the stock had not been subscribed for, and that was taken and paid for before the corporation commenced active business.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 244, 246–264, 1407, 1407½; Dec. Dig. ⊜80.]

5. CORPORATIONS ⊜80—STOCK SUBSCRIPTION INDUCED BY MISREPRESENTA-
TION—GROUNDS FOR RESCISSION.

A false statement, made by the officers at a stockholders' meeting, that the corporation had not lost money, by which a stockholder was induced to subscribe for his share of an increased issue of stock, held a material misrepresentation of an existing fact, which entitled the stockholder, as against the corporation, to a rescission of his subscription.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 244, 246–264, 1407, 1407½; Dec. Dig. ⊜80.]

Appeal from the District Court of the United States for the Western Division of the Southern District of Ohio; Howard C. Hollister, Judge.

---

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suit in equity by Harvey H. Roberts against the National Leather Company. Decree for complainant, and defendant appeals. Reversed in part.

In September, 1908, Mr. Paul Hooven and some associates, at Hamilton, Ohio, came into possession of a supposedly very valuable secret process for tanning leather. For its development and practice, they organized an Ohio corporation, called the National Leather Company, with a capital stock of $100,000 common, and $50,000 preferred. Their theory of organization, as now stated, is that the owners of the formula were to receive in payment for it all the common and $5,000 of the preferred stock, that the remaining $45,000 of the preferred was to be sold for cash (at 80 cents), and that the organizers would surrender $45,000 of common stock, so that each purchaser of preferred would receive also, without further payment, an equal amount of common. The greater part of the preferred was subscribed and paid for, but on November 10th there remained in the treasury, unissued, at least 78 shares of preferred. Of these, 30 shares were later paid for under subscriptions which very likely had been theretofore made, leaving at least 48 shares issued on and after November 10th, and not pursuant to any previous subscription.

The company, through Mr. Hooven, was endeavoring to sell this preferred stock, and Dr. Pryor, of Lexington, Ky., who had become a stockholder, was promised common stock compensation if he could place some. He interested his personal friend, Dr. Roberts, also of Lexington, and Dr. Roberts, on November 10th, subscribed for 10 shares of the preferred, and on February 18, 1909, subscribed for 20 shares more. As the result of these two subscriptions, Dr. Roberts paid into the company treasury $2,400. The company had begun business in a preliminary way in October, 1908; but before doing much actively, and as early as March, 1909, all the remaining preferred stock was issued and paid for. In September, 1909, it was decided to increase the capital stock, and Dr. Roberts subscribed for and paid in $1,200 additional. In January, 1910, he had become dissatisfied with the situation, and he then filed in the court below his bill in equity against the National Leather Company, asking a rescission of all his stock subscriptions and a return to him of the $3,600 and interest. The grounds of rescission relied upon by the bill, and as far as necessary to be now stated, are:

(1) That at the time of the first $800 subscription the stock so taken had previously been subscribed for by some one else, and was to be obtained by plaintiff through a transfer from the former subscriber, while in fact it was merely unissued treasury stock, and there was thus created, in Dr. Roberts' mind, a false conception of the value of the stock.

(2) That at the time of the $1,600 subscription and purchase a similar and false representation was made to the effect that this had been already taken, and was to be transferred from the existing subscriber.

(3) That at the time of the $1,200 subscription to the increased capital it was represented that the business of the company was then on a sure footing, that its operations up to that time had been conducted without loss, and that it needed additional working capital with which materials might be bought in larger quantities, while in fact the company business was not on a sure footing, and large losses had been incurred, and the stock increase was not designated to provide additional working capital, but to meet existing debts.

The District Court made a decree for the rescission of all the subscriptions and the return of the whole purchase price, and the Leather Company appealed.

Paul Scudder, of Hamilton, Ohio, for appellant.

H. B. Mackoy, of Cincinnati, Ohio, for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). 1. The record does not present the customary issues in such cases. It

was quite obvious, on the face of the matter as submitted to Dr. Roberts at the outset, that the investment was speculative, and might be either profitable or disastrous, according to what might prove to be the commercial value of the new process. The bill of complaint seems to recognize this situation, and does not allege that the company or its representatives made any misrepresentation affecting the value of this stock, save only as such misrepresentation might be found in the statements above recited. It is therefore almost, if not quite, immaterial if the process has turned out or may turn out to be a failure.

[1] 2. It is doubtful whether the pleader intended to plant the right of rescission merely on the theory that the statement that the stock had all been taken created a false conception of its value. The bill states, at length, details showing that Dr. Roberts, being in truth an original preferred stock subscriber, was entitled to an equal amount of common stock, but that Hooven and Pryor, by falsely stating that there was an original subscriber who insisted on keeping the common stock, persuaded Roberts to make his subscriptions and accept only 10 shares of common, instead of the 30 which he should have had. The bill strongly indicates that this withholding of common stock was the substantial grievance, and that the misrepresentations regarding the full original subscription were incidental to this plan by which Hooven and Pryor (apparently for Pryor) succeeded in "holding out" this common stock. The theory so presented by the record—i. e., that the false statement that there was a former subscriber who insisted on keeping the common stock entitles plaintiff to rescission of his preferred stock subscription—requires preliminary consideration; and what we now say applies to that theory only. We see no relation of cause and effect between the alleged false statement and the preferred stock subscription. The substance of the statement was that no common stock (or less than the full amount) could go with these blocks of preferred, and that Dr. Roberts must subscribe without getting all the benefits he could have had if he had been the original taker. The element of untruth tended to discourage, not to encourage, subscription. The preferred stock, as thus put before him, was less desirable than if the situation had been truly stated. The misrepresentation made it less likely that he would subscribe; but he did. Whatever remedy he may have along the line of this theory must be by way of direct reparation for the wrong done him—not by repudiating the contract, which was not induced by this wrong. Further, before relief against the corporation could be given on this theory, it would be necessary to consider and discard the claim that the common stock belonged to the organizers, personally, and that the corporation had nothing to do with it. In this connection, it should be stated that before the bill was filed, though after demand for rescission, the full amount of common stock to which he would have been entitled as an original subscriber was tendered to plaintiff, and there is no evidence that he was prejudiced by not receiving it at an earlier date. Probably in recognition of the situation just considered, we find that the case was disposed of below, and has been argued in this court, mainly

upon the question whether rescission was justified because of that misrepresentation of value supposed to be implied in the statement that all the stock had been subscribed; and we adopt that as the determinative issue.

3. The two preceding paragraphs have reference only to the rescission claimed of the first two stock subscriptions. As perhaps affecting all three, we are told by counsel that the company has gone into a receiver's hands; but the record does not show this, nor was any objection made because the company was insolvent and general creditors might be injured by allowing an apparent stockholder to be converted into a creditor. We cannot consider this question; but the result which we reach is without prejudice to its determination in any court which may have jurisdiction upon the marshaling of liabilities or otherwise, and in which it may be thought to be open. See Scott v. Deweese, 181 U. S. 202, 203, 21 Sup. Ct. 585, 45 L. Ed. 822; Davis v. Louisville (C. C. A. 6) 181 Fed. 10, 22, 104 C. C. A. 24, 30 L. R. A. (N. S.) 1011; note, 31 L. R. A. (N. S.) 900.

[2] 4. It is not clear why plaintiff's remedy at law was not adequate. The claim of fraud is not alone sufficient to give equity jurisdiction. U. S. v. Bitter Root Co., 200 U. S. 451, 472, 26 Sup. Ct. 318, 50 L. Ed. 550. However, a bill which seeks rescission on the ground of fraud is within a recognized head of equity jurisprudence (Tyler v. Savage, 143 U. S. 79, 95, 12 Sup. Ct. 340, 36 L. Ed. 82), and, in such a case, the question whether the suit is rightfully brought on the equity side will not be raised by the court of its own motion, but must be presented by the defendant at the first opportunity (Toledo Co. v. Computing Co. [C. C. A. 6] 142 Fed. 919, 923, 74 C. C. A. 89; Warmath v. O'Daniel [C. C. A. 6] 159 Fed. 87, 91, 86 C. C. A. 277, 16 L. R. A. [N. S.] 414).

[3] 5. The untrue representation that all the stock or a certain amount of stock has been subscribed has frequently been held so material as to justify a rescission of the subscription contract so induced, and for the reason that the amount of capital available may be of vital importance to success; but we cannot see room for the application of this principle here. No question is made about the sufficiency of the $5,000 preferred stock payment made by the organizers through a transfer of the formula, and the entire remaining preferred capital stock was actually subscribed, and the cash therefore, at the agreed rate, paid into the treasury—all before there was any occasion to use it. From this point of view, the corporation was not hurt, nor was plaintiff, as a holder of preferred stock, injured, because about 10 per cent. of the capital had not been subscribed when he was told that it had been. Its subsequent subscription and payment, so promptly that it was available to the corporation as soon as needed, cured any prejudice of this type which might otherwise have resulted.

[4] 6. Coming to what we have called the determinative question (as to the first two items): The District Judge was right in concluding that the statement that all stock had been subscribed was untrue. We need not interpret this representation as meaning that it had all been subscribed in writing, or even that it had all been subscribed by definite, enforceable promises. We assume, without deciding, the theory

most favorable to defendant—i. e., that the statement would be substantially true, if there were outstanding allotments or reservations which, as matter of fair dealing, the company ought to. recognize, and which, if closed by acceptance, would take all the stock. The testimony fails to satisfy us that even in this sense the last 48 shares were subscribed. The utmost which can be said is that there were enough persons to whom stock had been offered, and who had not 'declined the offer, to exhaust the amount unissued; and it clearly was essentially untrue to tell Dr. Roberts that he could get stock only by transfer of right from an existing subscriber. So we are brought squarely to the controlling question—whether such a false representation may be relied upon as material; whether it is a matter of fact substantially affecting the value of the stock offered. We are unable to find any reported case where rescission has been permitted for this or equivalent misrepresentation. There are many decisions (e. g., Sawyer v. Prickett, 86 U. S. [19 Wall.] 146, 164, 22 L. Ed. 105; Bank v. Cook, 125 Iowa, 111, 100 N. W. 72; Zabel v. Telephone Co., 127 Mich. 402, 86 N. W. 949) assuming or affirming the materiality of a statement that a certain named person has subscribed; and this is rather obvious, because a subscription or other participation by a person known or believed to be of good judgment is a kind of certificate from him that he approves the enterprise, and this certificate may rightfully affect the judgment of the person solicited to subscribe. Such was not the representation here. It was either, in a general way, that the stock had all been subscribed, or, specifically, that persons unnamed and unknown to Dr. Roberts, and upon whose implied certificate he could not be thought to rely, were giving up their respective portions to him. The substance and effect of the representation was only that the stock was so attractive that it had all been snapped up by those who had the first opportunity; and it is difficult to differentiate such a statement from one that the stock is being taken so rapidly that subscriptions must be made at once or it will be too late.

No one can justify the making of untrue statements of this type. If wholly or chiefly unfounded, they might support rescission; and yet when, as here, they were within 10 per cent. of accuracy, we are forced to think they are in the class concerning which one stranger dealing with another has no right to blind and absolute reliance, without resorting to the open channels of confirmation, and in the class which the law cannot accept as properly being materially persuasive inducements. The effect of this idea that the stock was all taken is accurately stated in the plaintiff's brief by saying that it "lent additional glamour" to the enterprise; but that is the sum total of the effect, and it is not enough. We are not confronted with special or peculiar reasons why a belief that all the stock is taken, or is rapidly being taken, may rightfully be treated as having been so far a moving cause of a subscription as to justify a rescission when that belief turns out to have been only temporarily mistaken. Such cases may arise. We have now to consider only the normal and naturally to be expected effect of this belief. We see no safe rule which can predicate rescission on such statements as these, and not leave the door dangerously wide open for repudiation in every case when the enterprise turns out

badly. We are not inclined to be the first to formulate such a rule; and we are confirmed in the resultant decision because we are satisfied that plaintiff was carried away by Dr. Pryor's expectation of great profits and was not much influenced by anything else. He says:

"I told Dr. Pryor that * * * I knew nothing about the company, but, if he thought the proposition was all right, I would take the stock."

Just as in Sawyer v. Prickett, supra, 86 U. S. at page 164, the "controlling influence was the idea" that the subscription would bring large returns. As between plaintiff and Dr. Pryor, the immediate agent in making the statements, there was such a relation of personal confidence as might support the suggested broader rule of dependence; but we do not see how Dr. Roberts can, as against the corporation, rely upon the peculiar results of that personal relationship. It is not suggested that the corporation knew of its existence, or knew that it could, or that it did, cut any figure in procuring the subscription.

7. Some reliance is put upon Dr. Pryor's statements that Hooven would manage the company, and that he was a fit and competent man therefor. Since plaintiff did not know Hooven, this was not much more than saying what must have been presumed; but there is no evidence of any lack of integrity in the conduct of the business, nor that any one could have done better with it than Hooven did.

[5] 8. As to the third or increased capital stock subscription, the circumstances are different. This was made by Dr. Roberts at a stockholders' meeting, and after the business had been running for several months. A circular letter had advised the stockholders that an increase was to be proposed, they were solicited to take their pro rata shares, and Dr. Roberts took his. The statement that the business was now on a "sure footing" we pass by; whether it was more than matter of opinion honestly held is not clear. The statement that "the company has not lost any money"—which we take to be a statement that there had been no net loss, or that the capital was not impaired—is a statement of an existing fact. Put in this positive form, it does not involve opinion; and we must consider it sufficiently proved that it was made in precisely this form. Dr. Roberts testifies that it was made at the meeting by J. C. Hooven, the president, and by Paul Hooven, the secretary, of the company, and neither one of these, although available, was called by defendant as a witness. Under such circumstances, the more or less argumentative denial, made by others of defendant's witnesses, has little force. Monthly trial balance statements, made up by an expert accountant at the time of the trial, from data which he found among the company's books and papers, tend to show that the net loss was: July 31, $6,400; August 31, $7,800; and September 30, $5,700. The statement in question was made at the meeting on September 15, and it thus seems probable that the preferred capital was then impaired between 10 and 15 per cent., although the impairment was being made up. It might have been easy to explain away this apparent loss, but the defendant made no effort to do so; and so we take it as an established fact. It does not appear that the books were so kept that on their face they disclose the loss, and so they would be unsatisfactory basis for holding that the officers knowingly or fraudulently

made a false statement; but this is immaterial, because fraud—the scienter—is not essential, if the statement is made by one upon whom plaintiff has a right to rely and if it is in fact false. Joslyn v. Cadillac Co. (C. C. A. 6) 177 Fed. 863, 867, 101 C. C. A. 77; Cook on Corporations (6th Ed.) § 356.

We cannot say that the demand for rescission was not made with reasonable promptness after Dr. Roberts learned that the capital was impaired at the time of this meeting; and, accordingly, we approve the conclusion of the District Court, so far as it referred to the third subscription and awarded rescission by returning the consideration thereof, with interest.

By reason of the modification in other respects, made necessary by the views we have expressed, the decree below is reversed, and the case is remanded for the entry of a new decree in accordance with this opinion. Appellant will recover costs of this court.